# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00069-CV

**The State of Texas, Appellant**

**v.**

**Lloyd S. McCarley et al., Appellee**

**FROM COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY
NO. 03-0400-CC2-4, HONORABLE JOHN McMASTER, JUDGE PRESIDING**

## O P I N I O N

The State of Texas appeals from a judgment in a statutory condemnation proceeding awarding Lloyd McCarley $366,820 as just compensation for the State's taking of 836 square feet from his property for use in the Texas Department of Transportation's construction of the State Highway 45 toll road project. The judgment was based on a jury's verdict on a single issue inquiring as to the amount of damages. The jury awarded $371,000. The trial court credited the State's prior deposit of the amount of the special commissioner's award in order to take possession—$4,180—to yield the judgment amount.

The State argues that the evidence is legally and factually insufficient to support the jury's damages award. At trial, McCarley presented proof that the State's use of his property severely diminished the value of his remainder by altering its drainage in a manner making it impossible for him to meet the City of Austin's requirements for obtaining the permits necessary to develop it. The State urges that such damages "do not arise from the condemnation of the 836 square feet or to the uses which will be made by TxDOT of the 836 square feet

[but] arise from an alleged use of TxDOT's existing right of way," and, consequently, are not compensable. *See State v. Schmidt*, 867 S.W.2d 769, 777-79 (Tex. 1993). Based on that same premise, the State argues that McCarley has asserted only an inverse condemnation claim. *See* Tex. Const. art. I, § 17; *City of Austin v. Casiraghi*, 656 S.W.2d 576, 579-80 (Tex. App.—Austin 1983, no pet.).[1] It brings several issues challenging whether McCarley's "inverse condemnation claim" is ripe where the property has not actually flooded and McCarley has not applied for and been denied a development permit, *see Hubler v. City of Corpus Christi*, 564 S.W.2d 816, 822-23 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.); whether McCarley properly pled and proved the intent element of an inverse condemnation claim, *see City of Dallas v. Jennings*, 142 S.W.2d 310, 314 (Tex. 2004); and whether McCarley retained a justiciable interest in his "inverse condemnation claim."

Because we conclude that the evidence was legally and factually sufficient to support the jury's award of $371,000 as damages for the State's statutory condemnation of McCarley's property, we will affirm the trial court's judgment.

To address the State's challenge to the jury's damages award, we apply the familiar standards of legal and factual sufficiency review.[2] With each, the starting point of our

---

[1] In apparent response to such arguments by the State prior to trial, McCarley asserted a "conditional counterclaim in inverse condemnation," pleading "[t]o the extent necessary . . . in inverse condemnation for damages resulting from the drainage problems caused by the project."

[2] We sustain a legal sufficiency complaint if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

analysis—barring a preserved and valid complaint of charge error—is the charge actually submitted to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 762 (Tex. 2003).(factual sufficiency); *Ancira Enters., Inc. v. Fischer*, 178 S.W.3d 82, 93 (Tex. App.—Austin 2005, no pet.). The State brings no complaint of charge error on appeal.

The sole issue submitted to the jury inquired:

> On September 16, 2003 [the date the State took possession of the property], what was the difference between (a) the fair market value of the landowner's whole property before the taking, excluding any consideration of the condemnation or proposed project and (b) the fair market value of the remainder only, after the taking, giving consideration to the uses to which the condemned part is to be subjected.
>
> * * *
>
> Answer by stating the difference in Fair Market Value in dollars and cents.

---

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id*. We review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller*, 168 S.W.3d at 807.

When reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). But we may not merely substitute our judgment for that of the jury. *Pool*, 715 S.W.2d at 635. The jury remains the sole judge of witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

The jury was given the following definitions:

> "Fair Market Value" means the price which the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it, taking into account all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within a reasonable future period. In making your determination of Fair Market Value, you will consider the "Highest and Best Use" of the land involved.

> "Highest and Best Use" means that legal use to which the property could have been adapted on the date of taking, or within the reasonably foreseeable future thereafter which was legally permissible, physically possible, financially feasible, and provided the owner with the greatest net return.

The jury was thus instructed to calculate McCarley's damages by comparing the fair market value of his property before and after the taking, reflecting both the loss of the part taken plus any diminution of the remainder's value. *See Westgate, Ltd. v. State*, 843 S.W.2d 448, 456-57 (Tex. 1992) (explaining that this form of submission is appropriate in cases where the part taken is difficult to value as severed land and there is no evidence that the condemnation increased the remainder's value).

The charge further directed the jury that, when calculating these measures of fair market value, its ultimate focus should be the price the property would have brought in a transaction between a willing seller and willing buyer at the time. *See City of Austin v. Cannizzo*, 267 S.W.2d 808, 812-15 (Tex. 1954); *State v. Carpenter*, 89 S.W.2d 194, 200 (Tex. 1936). To that end, Texas courts have long held it appropriate, as a general rule, for a jury to consider "all factors . . . which would reasonably be given weight in negotiations between a seller and a buyer" of the property.

4

*Cannizzo*, 267 S.W.2d at 814; *Carpenter*, 89 S.W.2d at 200 ("Generally, it may be said that it is proper as touching the matter of the value and depreciation in value to admit evidence upon all such matters as suitability and adaptability, surroundings, conditions before and after, and all circumstances which tend to increase or diminish the present market value."). Thus, the jury may consider current and reasonably probable future potential uses of the property, as well as consequential damages that it is reasonably foreseeable will result from the condemnor's uses of the condemned property, as such factors would ordinarily be given weight by willing buyers and sellers and, therefore, would be reflected in the property's fair market value. *See Spindor v. Lo-Vaca Gathering Co.*, 529 S.W.2d 63, 65-66 (Tex. 1975); *Cannizzo*, 267 S.W.2d at 814-15. Conversely, purely speculative potential uses or injuries are not probative of fair market value. *Id.* at 814 (willing seller-willing buyer test of market value "exclude[s] consideration of purely speculative uses to which the property might be adaptable but wholly unavailable but would permit consideration of all uses to which the property was reasonable adaptable and for which, or in reasonable probability would become, available within a reasonable time."); *Carpenter*, 89 S.W.2d at 200 ("Evidence . . . relating to remote, speculative, and conjectural uses, as well as injuries, which are not reflected in the present market value of the property" should be excluded); *see also Texas Elec. Serv. Co. v. Campbell*, 336 S.W.2d 742, 744-45 (Tex. 1960) (testimony that it was "possibly probable" that town would later expand so as to make property suitable for industrial uses was not probative of the property's fair market value).[3]

---

[3] As the supreme court has summarized these governing principles:

It has been uniformly recognized in the development and refinement of the market

5

These principles, in part, enable a landowner to recover all reasonably foreseeable consequential damages from the taking in the statutory condemnation proceeding and not be "burdened with the delay and expense of future lawsuits." *White v. Natural Gas Pipeline Co. of Am.*, 444 S.W.2d 298, 301 (Tex. 1969). In fact, a landowner's failure to seek all reasonably foreseeable damages in the condemnation proceeding may *bar* his future claims for those damages.

---

value test for determining severance damages that the *State v. Carpenter* method of trial and submission is appropriate in all but exceptional cases. The jury is instructed that the term market value is the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying. The jury is asked to find the market value of the remainder tract immediately before the taking and the market value thereof immediately after the taking. In the determination of the latter, the jury is instructed to take into consideration the uses to which the land taken is to be subjected. The answers to the issues are to be determined in the light of the evidence offered by the parties and admitted under the rulings of the trial court. As said in *State v. Carpenter*, everything which affects the market value of the land itself, having due regard for past and probable future injuries, may be accurately reflected by ascertaining the difference in value, when all the legitimate testimony is properly submitted to the jury for consideration; and it is proper to admit evidence upon all matters which tend to increase or diminish the present market value. The landowner may recover damages which are reasonably foreseeable, and he may show the reasonably probable uses of the tract taken that are calculated to depress the value of the remainder tract and thus enhance the recovery of damages. *See Cannizzo*, *supra*, where it was recognized that the determination of the value of a tract taken permits consideration of all uses to which the property was reasonably adaptable and for which it was, or in reasonable probability would become, available within a reasonable time. But the public authority should not be required to pay severance damages on the basis of uses of the tract taken which are not at the time of the taking so reasonably probable as to be reflected in present market value and the jury should be permitted to give such weight to this factor as a prospective purchaser of the remainder tract would give.

*City of Pearland v. Alexander*, 483 S.W.2d 244, 247-48 (Tex. 1972).

6

*See City of La Grange v. Pierratt*, 175 S.W.2d 243, 244-46 (Tex. 1943)[4]; *see also Casiraghi*, 656 S.W.2d at 579 (Tex. App.—Austin 1983, no pet.) ("In eminent domain proceedings the property owner is given a single opportunity to recover damages for the taking of his property for public use.").

The jury heard evidence that, at relevant times, McCarley had owned two adjacent undeveloped lots totaling approximately 1.75 acres in size. One lot, approximately 1.0106 acres in size, was situated at the corner of Ranch Road 620, a busy thoroughfare that ran generally east-west at that location, and Lyndhurst Street, which ran generally north-south until it ended at its intersection with 620. Both roads were originally at grade level. The second lot, roughly .7381 acres in size, sat immediately south of the first lot, its east side fronting Lyndhurst. As of the date of taking, the property was partially within the City of Austin, and the rest within the City's extraterritorial jurisdiction.

McCarley presented evidence that although he had not yet developed the property, he had previously performed extensive planning and permitting in anticipation of developing it

---

[4] In *Pierratt*, the City condemned a portion of Pierratt's service station property for use in widening a road. Pierratt was awarded compensation in the statutory condemnation proceeding. Subsequently, Pierratt sued for additional consequential damages, lost profits he attributed to loss of access to his business during the road construction. The supreme court held that Pierratt's suit was barred. It concluded that Pierratt's lost profits damages had been foreseeable at the time of the statutory condemnation proceeding where "this record shows that Pierratt knew, or could have known, the character of the street improvement at the time of the condemnation; and, furthermore, at such time he knew, or could have known, the terms of the contract under which it was to be consummated." *City of La Grange v. Pierratt*, 175 S.W.2d 243, 246 (Tex. 1943). The court further reasoned that because Pierratt "had such right [to recover his expected lost profits in the condemnation proceeding . . . we think it follows, as a matter of course, that it was his duty to do so." *Id.* at 246.

for commercial uses. In 1996, McCarley hired a land planner, Richard Crank, and an engineer, Curtis Wilson, to complete a subdivision of the property and obtain the necessary permits to develop the site. Wilson obtained general retail zoning for the portion within the Austin city limits. Crank prepared the necessary applications and obtained approval for a two-lot subdivision with a front-lot retail development and rear-lot office development. Wilson engineered a utility plan for water and wastewater service, which was approved, as well as a plan for stormwater abatement that was approved by the Texas Natural Resource and Conservation Commission. Wilson also designed a stormwater drainage and detention plan, which the City approved after requiring a restrictive covenant requiring that the two lots would share water quality and stormwater detention facilities and be developed only as a unified development. The City eventually granted full site plan approval for development of the property.

The jury heard evidence regarding the City of Austin's requirements that McCarley had to meet to obtain his site development permit. These included three forms of stormwater management regulations: (1) environmental regulations requiring that the property have ponds that would detain the rainwater falling onsite in a 2-year storm; (2) drainage criteria requiring the property to have ponds designed to retain the rainwater falling onsite in a 100-year storm, detain the water, and release it slowly at a rate no greater than the flow from the property's natural, pre-development state; and (3) requirements that the property be designed to receive all stormwater from a 100-year storm that would flow to the property from its entire natural upstream basin if the basin was fully developed, and pass it through the property contained in a dedicated

8

easement or public right-of-way. Wilson explained that he encountered some difficulties in satisfying these requirements stemming from the area's flat topography.

Although the State emphasizes that McCarley's site development permit had expired before it condemned his property, evidence that McCarley had succeeded in obtaining one is nonetheless probative of the reasonably foreseeable uses of McCarley's property before it was condemned. *See Cannizzo*, 267 S.W.2d at 814-15. McCarley's appraiser testified that the two lots constituted a single property for valuation purposes. He separately valued each lot in terms of their respective pre-condemnation highest and best uses—the "front" lot retail, the "back" lot office—as reflected in the market prices of comparable area properties with similar uses, adjusted for characteristics unique to the McCarley property. Based on this analysis, the appraiser valued McCarley's front lot at $400,000 and the back lot $75,000, for a total of $475,000. The State's appraiser, by contrast, opined that only McCarley's front lot should be considered as the relevant property for valuation purposes. He valued this lot, pre-condemnation, at $246,523.

The State condemned a 836 square-foot triangular "corner clip" from McCarley's front lot at the 620-Lyndhurst intersection. The property was to be used in TxDOT's conversion of part of 620 into the State Highway 45 toll road. Construction evidently was underway but not yet completed by time of trial. TxDOT's plans were to elevate the existing 620 roadway five to seven feet on a solid retaining wall within the existing right-of-way along McCarley's front lot. This road would serve as a frontage road for Texas 45. Lyndhurst would similarly be elevated on an embankment for several hundred feet to meet the new, higher frontage road at the site of the former intersection with 620. According to the State's engineering expert, the corner clip taken from

9

McCarley's property would be used in building an embankment area needed to raise the roadways and "to find a place maybe for utilities to make a bend and serve folks down Lyndhurst."[5] There was also evidence that this embankment served purposes within TxDOT drainage system for Texas 45. Wilson, McCarley's engineering expert, testified that during a 100-year storm, TxDOT's drainage system would cause stormwater from properties west of McCarley's to flow eastward through a ditch running beside the Texas 45 frontage road and alongside McCarley's property, where the Lyndhurst embankment would effectively function as a dam and cause the waters to pool there and flood McCarley's property. The waters would continue to rise until they spilled over Lyndhurst.

Although the State's engineering expert disputed Wilson's analysis—he insisted that a 24-inch pipe TxDOT was laying under Lyndhurst would sufficiently drain any stormwater from McCarley's side of that street—there was evidence consistent with TxDOT's anticipating that McCarley's property would flood. The State's appraiser testified that TxDOT intended to build concrete riprap in the corner clip area to prevent erosion at the Lyndhurst intersection. Also, during its negotiations with McCarley, TxDOT had contemplated constructing an 18-inch reinforced concrete pipe running from McCarley's property and through the corner clip that would drain water from McCarley's property. Further, as another component of the Texas 45 project, TxDOT designed and constructed a berm or wall near a school across Lyndhurst from McCarley's property. Wilson testified that the wall is located beyond where stormwater would overflow Lyndhurst from McCarley's property, adding that TxDOT had placed a concrete channel along the wall

---

[5] The witness explained that "[a] lot of times they don't like to do a 90 [degree turn] because they get losses."

10

that would divert stormwater toward a creek. TxDOT's own plans, in fact, termed this structure a "retaining wall."

The State's engineering expert, who had oversight responsibilities during the design phase of the Texas 45 project, testified that the "retaining wall" was actually intended to shield the school from noise likely to come from the elevated main lanes of Texas 45, which were to be several feet higher than the frontage roads. He explained that "[t]he plan sheets refer to it as a retaining wall because we're trying to help out the school and we can't call it anything else because we're not meeting federal mandates" to obtain federal funding for a noise wall, adding that "I'm probably going to get in a lot of trouble for saying that we built one anyway, but we did." However, the witness acknowledged that the agency had stopped short of "building a full blown, we're going to get in trouble, kind of sound wall," and he could not say that it would be effective given that the roadway was higher than the school. It was within the province of the jury to weigh the credibility of the State's explanations of its "retaining wall."

McCarley presented evidence that TxDOT's use of the corner clip to elevate roadways and in its drainage system have destroyed his ability to develop the remainder. Wilson explained that to re-permit the remainder, McCarley would be required to satisfy the same City of Austin stormwater management regulations that he had successfully met when obtaining his earlier development permit. These requirements, again, included demonstrating that his property had been designed to receive all stormwater from a 100-year storm that would flow to the property from its entire natural upstream basin if the basin was fully developed, and pass it through the property through a dedicated easement or public right-of-way. Wilson opined that McCarley no longer met

11

these requirements and that there was nothing McCarley could do to remedy noncompliance and obtain a permit to develop the remainder or any part of it. The State did not controvert Wilson's testimony regarding McCarley's ability to obtain the City of Austin permits required to develop his remainder. *See Cannizzo*, 267 S.W.2d at 814-15 (explaining that evidence of reasonably probable future changes in zoning of property may be probative of its uses and fair market value). The record also reflects that the State was made aware, prior to trial, of McCarley's concerns that its uses of the corner clip would cause flooding and prevent development of his remainder. *See Spindor*, 529 S.W.2d 65-66 (damages to remainder from erosion of road in condemned portion was foreseeable and could be recovered in statutory condemnation action; landowner testified that he had warned condemnor that its road would erode in heavy rain); *see also Pierratt*, 175 S.W.2d at 244-46 (landowner was required to seek any foreseeable remainder damages in the statutory condemnation proceeding).

McCarley's appraiser opined that the uses of the remainder to a willing buyer is comparable to that of property with greatly restricted uses, like Christmas tree sales. He calculated the remainder's fair market value as $72,000. Subtracting this figure from the pre-condemnation fair market value of McCarley's property yielded total damages of $403,000. The State's appraiser calculated the value of the remainder (which did not include the back lot) as $241,841, yielding total damages of $4,682. The State's appraiser acknowledged, however, that his analysis presumed McCarley's ability to develop the remainder and that the remainder would not be worth much if McCarley could not obtain the permits required to develop it. The jury's damages award of $371,000 is within this range of evidence presented.

12

The State's sole challenge to the sufficiency of the evidence supporting the jury's award is that any diminution in the value of McCarley's remainder is not compensable because it arose from the State's use of its existing right-of-way along the former 620 and not its use of the corner clip. *See Schmidt*, 867 S.W.2d at 777-79. We disagree. As the evidence we have surveyed demonstrates, McCarley's remainder damages arose from the use to which the State subjected the corner clip—elevating roadways and controlling stormwater—and not merely the State's use of existing right of way or other property. *See Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 221-22 (Tex. 2001) (landowner claimed that condemnation of property to widen freeway damaged remainder by causing building on remainder to violate setback ordinances and deed restrictions; damages were attributable to taking and not to entire highway expansion project); *State v. Heal*, 917 S.W.2d 6, 8 (Tex. 1996) (homeowner's claim for remainder damages for decreased access from taking of part of yard to widen road in manner creating bottleneck was distinguishable from claim based on impact of larger project to widen nearby freeway and residential arteries); *cf. County of Bexar v. Santikos*, 144 S.W.3d 455, 462-63 (2004) (damages for lessened access and visibility were attributable to State's elevation of roadway within existing right-of-way, not construction of embankment on condemned property to support elevated roadway; "the remainder property would be just as much 'in a hole' and no easier to access if the frontage road were supported by a wall or columns rather than a sloping shoulder"); *Schmidt*, 867 S.W.2d at 777-79 (claimed damages for diversion of traffic, circuity of travel, impaired visibility, and inconvenience from construction were attributable to overall project, not taking of small strips from property). We also note that the charge, in relevant part, inquired as to "the fair market value of the remainder only, after the taking, *giving*

13

*consideration to the uses to which the condemned part is to be subjected*," but did not require the jury to *isolate* the effect of the corner clip's uses to elevate roadways or control stormwater from that of other adjacent property devoted to the same uses. If there is any error in the form of that submission, it is waived. *See Harris County v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000). We overrule the State's evidentiary-sufficiency challenge to the jury's award of $371,000 as damages from the statutory condemnation of McCarley's property.

In light of this conclusion, we need not address the State's issues presuming that McCarley's damages are recoverable only under an inverse condemnation theory, and we express no opinion regarding them.

We affirm the trial court's judgment.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton
    Concurring Opinion by Justice Patterson

Affirmed

Filed:   December 20, 2007

14