COUNTY OF BEXAR, Petitioner,

v.

John L. SANTIKOS, Respondent.

No. 03–0471.

Supreme Court of Texas.

Argued April 7, 2004.

Decided Aug. 27, 2004.

457

Terry Topham, Davidson & Troilo, San Antonio, for petitioner.

Daniel M. Anderson, Steven R. Sampson and Sumer Irene Creel Shelton, Barron Adler & Anderson, L.L.P., Austin, for respondent.

Susan Desmarais Bonnen, Greg Abbott, Barry Ross McBee, Edward D. Burbach, Grady Click, Office of Atty. General, Austin, for amicus curiae.

Mary Belan Doggett, Lineharger Goggan Pena & Sampson, San Antonio, for other.

Justice BRISTER delivered the opinion of the Court.

In this condemnation action, we again address whether severance damages are recoverable when property is taken as a part of a project to raise a roadway above the natural grade. The question is a recurring one,[1] as the growth of controlled-access highways necessarily requires that, at intersections with other major arteries, one road or the other must change grades.

This case presents the issue in a new context—a roadway on the edge of the Texas Hill Country. As the name indicates, the region is not flat, and some properties are necessarily higher than others. Building a highway along the contours of every hill and dale would leave every property at grade level, but at considerable difficulty, discomfort, delay, and danger to the traveling public.

In this case, a sliver of property was taken for an embankment to support the elevation of a frontage road above an occasional creekbed. The question presented is whether lost market value of the remainder property is compensable because it is now well below the frontage road. The trial court held that it is, and the court of appeals affirmed.[2] We hold under the facts of this case that it is not, and thus reverse the court of appeals' judgment.

I

John L. Santikos owns a 27–acre tract of raw, unimproved land in northwest Bexar County, Texas. For about 2,000 feet, the property fronts Loop 1604 near its intersection with Portranco Road. As part of a project to widen Loop 1604, Bexar County

1. *See, e.g., State v. Munday Enters.*, 868 S.W.2d 319, 320 (Tex.1993) (per curiam); *State v. Centennial Mortgage Corp.*, 867 S.W.2d 783, 783 (Tex.1993) (per curiam); *State v. Schmidt*, 867 S.W.2d 769, 770 (Tex. 1993); *City of Waco v. Texland Corp.*, 446 S.W.2d 1, 2 (Tex.1969); *City of Houston v. Fox*, 444 S.W.2d 591, 592 (Tex.1969); *DuPuy v. City of Waco*, 396 S.W.2d 103, 104 (Tex. 1965).

2. 107 S.W.3d 677, 682–83.

sought to acquire 0.485 acres of the property, an irregular-shaped strip about 850 feet long and decreasing from 25 to zero feet wide.

The 27–acre tract slopes downhill from south to north, with 5 acres on the north side located in the 100–year flood plain of Caracol Creek. As part of plans for constructing a northbound frontage road on the existing right-of-way, the Texas Department of Transportation plans to raise the roadbed along 215 feet of the lowest part of the Santikos tract, and plans to use the 0.485 acres to serve as a sloping embankment.[3] The northern part of the Santikos tract is already 5 to 6 feet below the existing two lanes of Loop 1604; elevation of the frontage road will place parts of it 10 to 11 feet below the road surface. TxDOT does not plan to build any embankment along the remaining 1,785 feet of the tract fronting Loop 1604.

After attempts to buy the 0.485 acres failed, the County filed this condemnation action. Three special commissioners awarded $53,000 as compensation for the taking.[4] Santikos filed objections to the award, and requested a jury trial.[5]

At trial, experts for both sides agreed the tract's highest and best use was to hold it as an investment until population and traffic grew to support development for retail use. They disagreed a little on the value of the 0.485 acres taken, and disagreed a lot on the effect the taking would have on 3.5 acres of the remainder property abutting it.

According to experts for Santikos, the 3.5 acres will someday be occupied by "pad" users (banks, fast-food retailers, and the like), behind which will someday be a "big box" user (grocery store, home improvement warehouse, or the like). They testified the TxDOT plans would prevent normal driveways to this part of the tract, thus requiring longer access drives, moving pad users back, and preventing a "big box" at the back of the property. They also testified the embankment created a "market perception problem" for investors and developers, as this part of the property was now "in a hole." These problems could be cured (they explained) only by adding 60,000 cubic yards of fill dirt (plus a retaining wall, guardrail, and drainage improvements) to raise the 3.5 acres skyward, at a cost between $719,801 and $928,302.

By contrast, the County's witnesses concluded there was no damage to the remainder property, as it had the same elevation and utility before and after the taking. The County's engineer testified that a commercial driveway with an acceptable slope could be built to the 3.5 acres anywhere on the southern third of its 215–foot frontage. It was undisputed safe driveways could be built along the remaining 1,785–foot frontage of the whole tract.

Over the County's objections, the trial court instructed jurors that, in determining the diminution in fair market value of the 3.5 acres, they could "consider damages, if any, resulting from unsafe access or diminished market perception of the remainder," but could not consider "damages resulting from diminished visibility or diminished access to the remainder." The jury returned a verdict for Santikos for $400,000, and the trial court rendered

---

3. The County is acquiring the property, and TxDOT is responsible for constructing the project. The proposed embankment will meet TxDOT safety requirements by having a slope of three feet horizontal to one foot vertical (33 percent).

4. *See* Tex. Prop.Code § 21.014–.016.

5. *See id.* § 21.018.

judgment for that amount less $53,000 (the commissioners' award) deposited by the County and already withdrawn by Santikos.

The County appealed, and the court of appeals affirmed, holding that unsafe access and diminished market perception were appropriate grounds of recovery.[6] The County petitioned this Court for review, seeking a new trial because the damages alleged were not compensable.[7]

## II

■ The Texas Constitution requires governmental entities to compensate landowners adequately when property is taken for public use.[8] If a governmental entity condemns only part of a tract, adequate compensation is required for both the part taken and any resulting damage to the remainder.[9] Damages to remainder property are generally calculated by the difference between the market value of the remainder property immediately before and after the condemnation, considering the

nature of any improvements and the use of the land taken.[10] In addition, the State must pay for special repair and mitigation costs that would not be reflected in the lost market value.[11]

■ But not all damages to remainder property are compensable.[12] Whether damages can be recovered depends on what kind of damage is involved.[13] Compensability is a question of law for the court, and subject to de novo review.[14]

We have considered the effects of highway-elevation and frontage-road projects on many occasions before. For example, in *DuPuy v. City of Waco*, we held a landowner suffered compensable loss from construction of an overpass that raised the street in front of his property 14 feet above grade, and left him on a cul-de-sac that could be accessed only by threading the supporting columns.[15] But in *Archenhold Automobile Supply Co. v. City of Waco*, a companion case decided the same

---

**6.** 107 S.W.3d at 682–83.

**7.** The County preserved error by objecting to the experts' testimony regarding these damages at the end of cross-examination when the bases of their opinions became clear, *see Kerr–McGee Corp. v. Helton*, 133 S.W.3d 245, 252 (Tex.2004), as well as objecting to the jury instruction regarding them, and requesting a new trial because the verdict included them. Tex.R.App. P. 33.1.

**8.** Tex. Const. art. I, § 17 ("No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person.").

**9.** *State v. Schmidt*, 867 S.W.2d 769, 772 (Tex. 1993); *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194, 197 (1936); *see also* Tex. Prop. Code § 21.042(c).

**10.** *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 218 (Tex.2001) (citing *Carpenter*, 89 S.W.2d at 197); *see Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 627 (Tex.2002) (hold-

ing compensation in a partial taking "is measured by the market value of the part taken plus any diminution in value to the remainder of the land") (citing *Westgate, Ltd. v. State*, 843 S.W.2d 448, 456 (Tex.1992)).

**11.** *See Northborough*, 66 S.W.3d at 224; *Centennial Mortgage Corp.*, 867 S.W.2d at 784.

**12.** *Northborough*, 66 S.W.3d at 218 (noting "not all condemnation damages are compensable"); *see City of Austin v. Travis County Landfill Co., L.L.C.*, 73 S.W.3d 234, 242 (Tex. 2002) (noting Texas Constitution does not " 'require compensation for every decrease in market value attributed to a governmental activity' ") (quoting *Felts v. Harris County*, 915 S.W.2d 482, 484 (Tex.1996)).

**13.** *See Northborough*, 66 S.W.3d at 218–20; *Schmidt*, 867 S.W.2d at 774–81.

**14.** *Northborough*, 66 S.W.3d at 220.

**15.** 396 S.W.2d 103, 110 (Tex.1965).

day involving the same project, we held compensation was not required to a business that retained other reasonable means of ingress, and thus suffered only partially diminished access to its property.[16]

In *State v. Schmidt,* we considered conversion of Highway 183 in Austin to a controlled-access highway, a project that eliminated grade-level crossings by lifting the roadway 37 feet in the air.[17] While allowing recovery for land actually taken to widen the right-of-way, we held unrecoverable any severance damages to the remainder for diversion of traffic, increased circuity of travel, lessened visibility, and inconvenience of construction activities.[18]

More recently, in *Interstate Northborough Partnership v. State,* we considered a project to widen Interstate 45 in Houston that required moving the frontage road to within 22.5 feet of an office building, erecting two 6.5 foot retaining walls, and relocating or closing two of five driveways.[19] While holding the lost driveways were not compensable, we held the costs of rearranging the remaining ones to ensure safe access were.[20]

Well aware of these cases, counsel for Santikos repeatedly denied making any claim that had anything to do with diminished access, diminished visibility, or circuity of travel. Instead, Santikos limited his claims for compensation to "unsafe access" and "diminished market perception." We examine each in turn.

### III

■ We turn first to the unsafe access claim. The embankment to be constructed on the land taken will be too steep for driveways allowing direct access from the frontage road to the 3.5–acre tract abutting it, at least along the northern 215 feet. Consistent with the cases noted above, Santikos cannot collect damages for lost access, as reasonable access to his tract is still available along at least 90 percent of its frontage on Loop 1604. But he does assert that because longer ramps or meandering access drives will have to be constructed to the 3.5–acre tract, the property cannot be as fully developed, and thus has lost value for which he should be compensated.

■ Impaired access to remainder property is a compensable special injury only if a material and substantial impairment of access exists as a matter of law.[21] That a public project requires increased circuity of travel is not enough to make damages compensable.[22] Nothing in our previous cases suggests that circuity of travel *within* a particular property is any more compensable than circuity of travel *around* it.

More important, it is hard to find any effects on access here, as the tract has no businesses, homes, driveways, or other improvements of any kind. Easy access to the frontage road remains along 90 percent of the Santikos tract; the only claim is that someday a developer might want to build a driveway at the single most difficult and expensive location on the entire property. There may be cases in which access to raw land is materially and sub-

---

16. 396 S.W.2d 111, 114 (Tex.1965).

17. 867 S.W.2d at 771.

18. *Id.* at 778–79.

19. 66 S.W.3d at 217.

20. *Id.* at 224.

21. *Id.* at 220; *State v. Heal,* 917 S.W.2d 6, 11 (Tex.1996).

22. *Northborough,* 66 S.W.3d at 219; *Schmidt,* 867 S.W.2d at 770, 774.

stantially impaired by a road project, but as a matter of law there is no such impairment in this case.

■ Nevertheless, costs to mitigate damage or move existing driveways or other improvements may be compensable even *if impaired access is not.*[23] But again, no driveways or other improvements need to be moved in this case. Unimproved property is often targeted for public projects primarily because no improvements have to be moved or impaired. Mitigation damages may be recoverable in some cases to return raw land to its natural state, but they are not recoverable to move or repair improvements that are not there.

Finally, it is immaterial that Santikos couches his claims not in terms of impaired access, but for "reduced physical adaptability" (*i.e.*, development will be less extensive and more expensive). The sole reason alleged for having to alter development plans is because of impaired access. Allowing impaired access claims in the guise of modified development claims would grant compensation to owners of unimproved land, even though it would be denied to those who actually have existing improvements to which access is impaired.

This case might be quite different if driveways or other improvements were already in place, or if Santikos owned only the 3.5–acre tract and needed permission from his neighbors to access the Loop 1604 frontage road. But neither is the case. Assuming Santikos or future owners decide to develop the 3.5–acre tract separately from the rest, they may dedicate the necessary easements for access to it. We hold that damages related to access are noncompensable here, as reasonable access to both the 3.5 acres and the remainder of the Santikos tract remains.[24]

## IV

■ The County also complains that the trial court improperly allowed Santikos to recover damages for "diminished market perception." The term appears to have been introduced by this litigation; no Texas case has used it before. The court of appeals found diminished market perception compensable; for several reasons, we disagree.

The term appears to be a malleable one as used by counsel and witnesses for Santikos. First, his expert testified that it recognizes that "people do not want to go down into a hole to do business." He did not suggest this was a matter of claustrophobia, taphephobia,[25] or some other irrational impulse; when pressed to explain, his opinion proved to be based on a combination of diminished access, diminished visibility, loss of view, and loss of "curb appeal."

Of these four, none would be independently recoverable under these facts. Diminished access is noncompensable for the reasons noted above. And Santikos denies making any claim for diminished visibility, recognizing that a landowner "has no right to insist that his premises be visible." [26]

23. *Northborough*, 66 S.W.3d at 224; *State v. Centennial Mortgage Corp.*, 867 S.W.2d 783, 784 (Tex.1993) (per curiam).

24. *See Heal*, 917 S.W.2d at 11; *City of Waco v. Texland Corp.*, 446 S.W.2d 1, 2 (Tex.1969); *Archenhold Auto. Supply Co.*, 396 S.W.2d 111, 114 (Tex.1965); *cf. State v. Munday Enters.*, 868 S.W.2d 319, 320 (Tex.1993) (per curiam) (noting that State conceded compensability in action for partial, permanent denial of access to public roadway along 249 feet of 893 foot perimeter fronting highway).

25. "The fear of being buried alive." Webster's New Int'l Dictionary 2580 (2d ed.1961).

26. *Schmidt*, 867 S.W.2d at 774.

Nor are we persuaded by the assertion that diminished market perception really means the loss of views *from* the property, not toward it. Santikos presented no evidence or estimate of damages that would result if users of a future big-box store had to settle for partially obstructed views. Thus, even assuming (without deciding) that damages for an obstructed view are compensable,[27] there was no evidence to support such a claim here.

It is true that in *Northborough* we held compensable the loss of a lot's aesthetic aspects ("curb appeal").[28] But that case involved the landscaped campus of an existing office building, and damages resulting from its resulting proximity to an interstate highway. We expressly held such damage was peculiar to that property, as it was not suffered by an adjoining property that was vacant, like the land involved here.[29]

But this was not the only explanation for what "diminished market perception" means. One expert testified (and the court of appeals agreed) that the term "was not concerned with how the passerby saw the property, but how potential developers would perceive the land as an investment."[30] It is no doubt true that developers see things that passersby do not. But the landowners in *Schmidt* (where passersby were lifted 37 feet above them) were not suing for lost sales, but for lost property value because their location was now less desirable. Our holding in *Schmidt* necessarily assumed that lessened visibility *as perceived by a potential investor in the property* was the item that was noncompensable.

Third, in his brief Santikos says the term is "shorthand for the taking's various adverse consequences." If the consequences of the taking give developers a "diminished perception" of the property, they will no doubt pay less for it. But this renders the term no different from "diminished property value" generally.

As previously noted, not every decrease in the property value is compensable. To recover, Santikos must show not just that the property value has decreased, but why. Because all of the claims denominated as "diminished market perception" represented noncompensable damages, they cannot be transmuted to compensable ones by asserting them under a pseudonym.

## V

■ Finally, even if these damages could be compensable in some other case, they would not be so here, as they arise from the use of adjoining property and are imposed on the community generally.

■ Damages to remainder property are recoverable only to the extent they arise from public use of the condemned land, not from public use of land the public already owns.[31] Santikos points out that the land taken here will be used to help

---

**27.** *See State v. Clark*, 161 Tex. 10, 336 S.W.2d 612, 618 (1960) (holding owner of tourist court was entitled to damages only for widening of road into parkway, not for elevated bridge on existing right-of-way that obstructed his view); *Butler v. State*, 973 S.W.2d 749, 757–58 (Tex.App.CAustin 1998, writ denied) (holding exclusion of such evidence error, but harmless); 4A Julius L. Sackman, Nichols on Eminent Domain § 14A.03[5], at 60 (3d ed.2004) (noting some states have afforded compensation for loss of aesthetic value of view where it can be shown to result in loss of

market value to the remainder) (citing *Tex. Power & Light Co. v. Trinity Valley Ranch Co.*, 395 S.W.2d 866, 871 (Tex.Civ.App.Dallas 1965, no writ)).

**28.** *Northborough*, 66 S.W.3d at 217.

**29.** *Id.* at 223.

**30.** 107 S.W.3d at 683.

**31.** *See* Tex. Prop.Code § 21.042(c); *Northborough*, 66 S.W.3d at 219 (holding damage to

raise the frontage road, while that taken in *Schmidt* was used not in elevating the main roadway but in widening a road below.[32] The embankment here will be on the condemned property, but the elevated frontage road will not. The remainder property would be just as much "in a hole" and no easier to access if the frontage road were supported by a wall or columns rather than a sloping shoulder. The damages alleged by Santikos arise from elevation of the frontage road, not from the method selected by TxDOT to support it.

■ Even if damages arise from use of adjoining land, they may still be recoverable if the land taken is an indispensable and substantial part of the general project, and damages to the remainder cannot be separated between use of the condemned land and use of the adjoining land.[33] But the strip taken here was neither indispensable nor a substantial part of the frontage road project, and the damages alleged to the remainder property would have occurred in any event from raising the frontage road on the existing right-of-way. Accordingly, they are not compensable.

■ Finally, damages to remainder property are recoverable only to the extent they represent injuries peculiar to the property owner that are not experienced in common with the general community.[34] It is the nature of injury rather than proximity to the project that determines this issue.[35]

Santikos sought compensation of almost $1 million, based mostly on the cost to raise the 3.5–acre tract alongside the embankment. There was conflicting evidence about the effect being "in a hole" had on market values in the hilly areas outside San Antonio, but the benefits or injuries were necessarily common to the community of adjacent owners in this entire area. While the 3.5–acre tract here may be impacted more severely than others, the difference is one of degree and not of kind.[36]

■ From the proposition that landowners have no right to insist that their premises be visible,[37] it follows that they have no right to insist that they remain at grade level. Santikos' complaint that the road embankment will create a ten-foot "straddle" along part of his property would apply to almost every landowner in the area, including those above grade as well as those below it. If taxpayers must pay to have every abutting valley in the Texas Hill Country lifted up and every mountain and hill made low, the natural contours of the entire region will be changed. We hold that any damages resulting from leaving unimproved, raw land in its natural state while raising or lowering an adjacent roadbed in hilly terrain are community in nature.

## VI

■ Long before there were many controlled-access highways, we recognized

---

office building compensable, as it arose from State's construction of frontage road on part condemned rather than entire highway-expansion project); *Clark*, 336 S.W.2d at 618 (holding damage to tourist court compensable only to extent it arose from portion of elevated ramp resting on condemned parkway rather than portion on existing right-of-way).

**32.** *Schmidt*, 867 S.W.2d at 777–79.

**33.** *Northborough*, 66 S.W.3d at 219; *Schmidt*, 867 S.W.2d at 777–78.

**34.** Tex. Prop.Code § 21.042(d); *Northborough*, 66 S.W.3d at 219; *Schmidt*, 867 S.W.2d at 779.

**35.** *Northborough*, 66 S.W.3d at 219; *Schmidt*, 867 S.W.2d at 781.

**36.** *Schmidt*, 867 S.W.2d at 781 (holding damages common to community as they differed only in degree, not kind, of injury).

**37.** *Id.* at 774.

that the benefits they bestow on the public often come at the unrecoverable expense of abutting landowners:

> If the public authorities could never change a street or highway without paying all persons along such thoroughfares for their loss of business, the cost would be prohibitive. The highways primarily are for the benefit of the traveling public, and are only incidentally for the benefit of those who are engaged in business along its way. They build up their businesses knowing that new roads may be built that will largely take away the traveling public. This is a risk they must necessarily assume.[38]

Landowners are not entitled to damages every time they are denied direct access to a new major highway.[39] We believe that bars most of the damages alleged here.

 The jury verdict here included both compensable damages (for the land taken) and noncompensable damages (to the remainder). When compensable and noncompensable damages are combined in a condemnation judgment, we must reverse and remand for a new trial that will assess only the former.[40] Accordingly, we reverse the court of appeals' judgment and remand for a new trial in accordance with this opinion.

Justice SCHNEIDER did not participate in the decision.

---

**38.** *Id.* at 773 (quoting *State Highway Comm'n v. Humphreys,* 58 S.W.2d 144, 145 (Tex.Civ. App.San Antonio 1933, writ ref'd)).

**39.** *DuPuy v. City of Waco,* 396 S.W.2d 103, 109 (Tex.1965) ("[A]n abutting property owner does not have a vested interest in the traffic that passes in front of his property; ... he cannot recover for loss of trade resulting from a highway relocation; and ... he is not entitled to damages because of the construction of controlled access highways in such manner as to deny direct access to the new major highway.").

**40.** *Northborough,* 66 S.W.3d at 220.