# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00714-CV

**State of Texas, Appellant**

**v.**

**Chris Petropoulos and Helen C. Petropoulos, Appellees**

### FROM THE COUNTY COURT AT LAW NO. 1 OF TRAVIS COUNTY
### NO. 2420, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arises from a statutory condemnation action filed by the State of Texas against Chris Petropoulos and Helen C. Petropoulos for a partial taking of their property for use in a highway project. The State appeals the judgment awarding the Petropouloses $303,178 as compensation for the taking. For the reasons that follow, we affirm the judgment of the trial court.

## BACKGROUND

At the request of the Texas Transportation Commission, the State in March 2002 brought a condemnation suit to acquire 0.33 of one acre (152,460 square feet) out of a 3.5 acre tract of land owned by the Petropouloses located on U.S. 290 in Travis County, Texas, for use in a highway project. The property is located on the northwest corner of U.S. 290 and Rosson Drive, near the "Y" in the Oak Hill area in Austin, Texas. At the time of the taking, the property was vacant

and had an interim zoning designation of rural residential ("RR").[1] The property obtained its interim zoning when the City of Austin annexed the property in the 1980s. The portion of the property that the State acquired was a strip along the length of the property's frontage on U.S. 290.

Special commissioners were appointed and, after a hearing, they awarded $116,080 to the Petropouloses as compensation for the partial taking of their property. *See* Tex. Prop. Code Ann. §§ 21.014-.015 (West 2003). The State filed objections to the award, deposited the award to the Petropouloses with the court on November 22, 2002, took possession of the condemned portion of the property, and the condemnation action proceeded as a civil case. *See id*. § 21.018 (West 2003).

One week before the jury trial began in July 2004, the State filed a motion to exclude the expert testimony of Mark Smith, the Petropouloses' designated real estate appraiser. The State did not challenge Smith's qualifications, but sought to exclude his testimony on the basis of relevance and reliability because Smith only appraised the whole property prior to the taking, did not appraise the portion of the property that the State acquired, did not determine if there was a diminution in value in the remainder property, did not give an opinion regarding just compensation

---

[1] Section 25-2-54 of the Austin Land Development Code reads:

> Rural residence (RR) district is the designation for a low density residential use on a lot that is a minimum of one acre. An RR district designation may be applied to a use in an area for which rural characteristics are desired or an area whose terrain or public service capacity require low density.

Austin, Tex., Land Dev. Code § 25-2-54 (2003).

2

due, and valued the property based on a specific use of a car wash combined with an express lube facility. At a pre-trial hearing, the trial court denied the State's motion to exclude.[2]

The parties' primary dispute at trial was the market value of the whole property as of the date of the taking, November 22, 2002. The parties agreed that the property's development was subject to impervious cover limitations, that sewer services were not available, and that the City of Austin would approve more intense zoning on the property than RR, but the parties disputed the zoning that was obtainable, the highest and best use of the property before the taking, and the market value of the property based on their respective positions as to the highest and best use of the property. The Petropouloses contended that the City of Austin would approve zoning of community commercial ("GR")[3] and that the highest and best use for the property was a car wash combined with an express lube facility. The State contended that the City of Austin would approve zoning of limited office ("LO")[4] and that the highest and best use for the property was an office building.

---

[2] The parties entered into a written stipulation that the trial court heard the State's motion to exclude the expert testimony of Smith at the pre-trial hearing, the hearing was recorded but the court reporter was unable to prepare a reporter's record of the hearing because she lost her stenographic notes, no evidence was offered at the hearing, and the trial court denied the motion to exclude at the conclusion of the hearing.

[3] Section 25-2-98 of the Austin Land Development Code reads:

Community commercial (GR) district is the designation for an office or other commercial use that serves neighborhood and community needs and that generally is accessible from major traffic ways.

Austin, Tex., Land Dev. Code § 25-2-98 (2003).

[4] Section 25-2-94 of the Austin Land Development Code reads:

Limited office (LO) district is the designation for an office use that serves neighborhood or community needs and that is located in or adjacent to residential

3

The State's witnesses included Greg Guernsey, the manager of the zoning case management division of the neighborhood planning and zoning department of the City of Austin; Bobby Jo Cornelius, an architect and owner of a land planning development consulting company; and Paul Hornsby, a real estate appraiser. Guernsey testified concerning the property's zoning designation of RR,[5] that city staff would make a recommendation on an application for a zoning change to the property, that city staff would look to a study that was done on the Oak Hill area in the 1980s (the "Oak Hill Study") to determine the recommendation for a zoning change, and that the Oak Hill Study recommended that the property be zoned LO. Cornelius testified that the highest zoning for the property was LO. Hornsby similarly testified that the highest and best use for the whole property was "[l]imited office, consistent with the LO zoning designation that's set out in the Oak Hill study. With B.J. Cornelius help, about a 14,000 square foot building." Hornsby's appraised market value for the whole property prior to the taking was $304,920, for the value of the part to be acquired was $28,750, and for the value of the remainder property both before and after the taking was $276,170. He determined that the part taken did not have the "size and shape" to function as an "independent economic" unit, and he valued the part taken as a "pro rata part" of the

neighborhoods. An office in an LO district may contain one or more different uses. Site development regulations and performance standards applicable to an LO district use are designed to ensure that the use is compatible and complementary in scale and appearance with the residential environment.

Austin, Tex., Land Dev. Code § 25-2-94 (2003).

[5] Guernsey testified: "RR is a rural residential classification, it has a minimal lot requirement of 1 acre, it may be used for single-family purposes, some [ ] uses like churches and schools, but mainly it's a residential classification."

entire tract: "I treated it just like the whole property and appraised it at $2.00 a square foot." He also opined that the highway project did not affect the value of the remainder property and that the total compensation owed to the Petropouloses was $28,750.

The Petropouloses' expert witnesses were William T. Carson, a land planner; Sarah Crocker, a land development consultant; and Mark Smith. Carson testified to commercial zoning and development in the area of the property, a range of possible uses for the property without considering the proposed highway project and pending condemnation, and his opinion that the "maximum development potential" for the property as of November 2002 was "two similar and compatible uses, car washes and car lubrication places." He testified that these uses would comply with the impervious cover limitations and would be allowed in zoning of GR. Crocker testified concerning the impact that the announcement of the highway project in the 1980s has had on commercial development along U.S. 290 in the area of the property, that the Oak Hill Study was a "dinosaur" and that it had "no relevance in today's economy or market," the process for applying for a zoning change with the City of Austin, and that, in her opinion, the zoning that was "reasonably probable" to obtain on the property was a designation of GR.

Smith testified that he relied on the opinions of Crocker and Carson in forming his opinion as to the value of the whole property before the taking. His appraised market value of the whole property was $630,000 as of November 2002. He also testified that the highway project was announced and pending "for at least 20 years" and to the effect that the project's "uncertainty" has had on development along U.S. 290 in the area of the property, but he did not offer an opinion as to the value of the remainder property after the taking. The Petropouloses offered and the trial court

admitted the deposition testimony of the State's expert Hornsby that the market value of the remainder property after the taking was $276,170.

The jury was asked to determine the fair market value of the whole property, excluding consideration of the proposed highway project and pending condemnation. The jury answered $579,348. The trial court entered judgment that the total compensation due the Petropouloses was $303,178, based on the finding of the jury as to the market value of the whole property and the trial court's finding that the evidence was conclusive that the market value of the remainder property, immediately after the taking and considering the uses to which the part taken was to be subjected, was $276,170.[6] The State filed a motion for new trial which was overruled by operation of law. This appeal followed.

**ANALYSIS**

In five issues, the State contends that (1) there is no evidence or jury findings to support compensation for any damages or for compensation in the amount of $303,178; (2) the trial court erred in submitting a jury question that failed to state a proper legal measure of damages and in refusing to submit the State's requested questions; (3) the trial court erred in granting a directed verdict as to the market value of the remainder property; (4) the trial court erred in preventing the State from telling the jury the effect of its answer on the amount of compensation awarded in a

---

[6] The award of $303,178 equals $579,348, the jury's finding as to the value of the whole property before the taking, less $276,170, the trial court's finding as to the value of the remainder property after the taking.

6

condemnation case; and (5) the trial court abused its discretion in admitting the testimony of the Petropouloses' expert Smith because his testimony was not reliable or relevant.

*Standard of Review*

The State challenges the legal sufficiency of the evidence to support the judgment. A legal sufficiency challenge may be sustained when the record discloses one of the following situations:

> (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; [or] (d) the evidence establishes conclusively the opposite of the vital fact.

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (quoting Robert W. Calvert, "*No Evidence*" & "*Insufficient Evidence*" *Points of Error*, 38 Tex. L. Rev. 361, 362-63 (1960)). In determining whether a finding is supported by legally sufficient evidence, we view the evidence in the light most favorable to the finding, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id*. at 807. We indulge every reasonable inference that would support the finding. *Id*. at 822.

The State further contends that the trial court erred in its charge to the jury and in admitting expert witness testimony. Complaints of error in the jury charge and in the admission of expert witness testimony are reviewed under an abuse of discretion standard. *Larson v. Downing*, 197 S.W.3d 303, 304-05 (Tex. 2006) (standard of review for trial court's ruling on admissibility of expert testimony); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001) (same);

7

*In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000) ("The trial court has considerable discretion to determine necessary and proper jury instructions."). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). The trial court has "broad discretion to determine admissibility" of expert witness testimony, *see Helena Chem. Co.*, 47 S.W.3d at 499, and "in submitting jury questions so long as the questions submitted fairly place the disputed issues before the jury." *Toles v. Toles*, 45 S.W.3d 252, 263 (Tex. App.—Dallas 2001, pet. denied).

To reverse a judgment based on a claimed error in either an evidentiary ruling or in the jury charge, a party must show that the error probably resulted in the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); Tex. R. Evid. 103(a) (error may not be "predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (exclusion of evidence); *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) (error in refusing an instruction); *Niemeyer v. Tana Oil & Gas Corp.*, 39 S.W.3d 380, 387 (Tex. App.—Austin 2001, pet. denied) (error in jury charge).

The State also contends that the trial court erred in granting a partial directed verdict for the Petropouloses as to the fair market value of the remainder property and in denying a partial directed verdict for the State. A court may instruct a verdict if no evidence of probative force raises a fact issue on the material questions in the suit. *See Prudential Ins. Co. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994). A directed verdict is proper for a defendant when a plaintiff fails to present evidence

8

raising a fact issue essential to the plaintiff's right of recovery or if the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *See Prudential Ins. Co.*, 29 S.W.3d at 77. We consider all the evidence in the light most favorable to the party against whom the verdict was directed, disregarding all contrary evidence and inferences and giving the party the benefit of all reasonable inferences created by the evidence. *Szczepanik*, 883 S.W.2d at 649. If there is any conflicting evidence of probative value on a theory of recovery, the directed verdict is improper and the case must be reversed and remanded for jury determination of that issue. *Id*.

### *Sufficiency of Evidence to Support Condemnation Award*

In its first issue, the State contends there is no evidence or jury findings to support compensation for any damages or for compensation in the amount of $303,178. The State does not contend that the measure of damages that the trial court used was improper, but contends that the trial court improperly applied the measure so as to enable the Petropouloses to recover for damage to the remainder property. The State argues that no compensation should have been awarded for damage to the remainder property because the only offered evidence was that there was no damage to the remainder property.

In urging that there was no damage to the remainder property, the State relies on (i) Hornsby's testimony on the State's behalf that the remainder property's highest and best use and the market value of $276,170 were the same before and after the taking and (ii) the experts' agreement that there was a larger area of the property that could be developed after the taking. The State also relies on the Petropouloses' experts: Carson's testimony that the use of a car wash combined with

a lube facility was physically possible on the remainder property,[7] Crocker's testimony that the remainder property could obtain zoning of GR, and Smith's testimony that the use of a car wash combined with an express lube may be physically possible on the remainder property.

Both the United States and the Texas Constitutions require governments to compensate landowners for the takings of their property for public use. U.S. Const. amend. V (requiring "just compensation"); Tex. Const. art. I, § 17 ("adequate compensation"). The central damages issue in the typical condemnation case is how to measure the market value of the condemned property. *See City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). When a governmental entity condemns only part of a tract of land, adequate compensation is required for both the part taken and any resulting damage to the remainder property.

---

[7] Carson testified during cross-examination:

Q.     So when I say impervious coverage, that means that is the actual square footage on the property that can be developed on; is that right?

A.     That can have building and parking, yes.

Q.     And isn't it true that in the remainder property that there is actually more property that can be developed on than what you determined for the whole property?

A.     That is correct.

Q.     So the use you showed here, the car wash and lube facility, can you tell the jurors, is that physically possible on the remainder property?

A.     Yes, ma'am; it is.

*See County of Bexar v. Santikos*, 144 S.W.3d 455, 459 (Tex. 2004); *see also* Tex. Prop. Code Ann. § 21.042(c) (West Supp. 2008).[8]

In this case, the parties agreed that a proper measure of damages for both the part taken and any resulting damage to the remainder property was the difference between the market values of the whole property prior to the taking and the remainder property after the taking giving consideration to the uses to which the condemned part was to be subjected. *See Westgate, Ltd. v. State*, 843 S.W.2d 448, 456-57 (Tex. 1992) (measure of damages when part taken "does not constitute a separate economic unit" and condemnation does not increase the value of the remainder property). We turn then to a review of the evidence to support the damages award under this measure of damages and a finding that the remainder property was damaged by the taking.

The market value of the remainder property after the taking was not contested. Both parties relied on Hornsby's expert opinion that the value of the remainder property was $276,170 or $2.00 per square foot, considering the use to which the part taken would be subjected. Hornsby based his market value estimate on his conclusion that the highest and best use for the remainder property was an office building. Smith testified he did not appraise the remainder property "[b]ased

---

[8] Section 21.042(c) of the property code reads:

> If a portion of a tract or parcel of real property is condemned, the special commissioners shall determine the damage to the property owner after estimating the extent of the injury and benefit to the property owner, including the effect of the condemnation on the value of the property owner's remaining property.

Tex. Prop. Code Ann. § 21.042(c) (West Supp. 2008). "Damages to remainder property are generally calculated by the difference between the market value of the remainder property immediately before and after the condemnation, considering the nature of any improvements and the use of the land taken." *County of Bexar v. Santikos*, 144 S.W.3d 455, 459 (Tex. 2004).

11

on the information from the client that they were in agreement with the State's appraiser [Hornsby]—the appraised value of the remainder, or didn't disagree with it, I should say."

In contrast, the parties contested the market value of the whole property prior to the taking and the effect that the taking had on the value of the remainder property. The State's expert Hornsby opined that the condemnation and pending highway project did not affect the market value of the property, and he valued the whole property, as he valued the remainder property after the taking, at $2.00 per square foot to reach a market value of $304,920. Hornsby opined that the property could be utilized in the same way regardless of the taking, that there was a larger area of the property available for development after the taking, and that the highest and best use of the whole property was as an office building. He reached his opinion as to the whole property's market value using the comparable sales approach for appraising real property, comparing four land sales with adjustments to reach his determination of the whole property's market value.[9]

The Petropouloses' expert Smith provided conflicting testimony. Although he also used the comparable sales approach for appraising real property, Smith opined that the market value of the whole property before the taking was $630,000. He testified that he relied on the opinions of Carson and Crocker as to obtainable zoning and possible uses of the property and compared land

_____

[9] Hornsby determined the unit price per square foot for each of the four sales with adjustments to reach his opinion that the whole property had a market value of $2.00 per square foot both before and after the taking. The unit prices per square foot on the four land sales that he used to reach his opinion were $3.00, $2.75, $3.30, and $4.50. He adjusted these unit prices per square foot based on such factors as market condition, location, and entitlements to reach adjusted values per square foot of $1.66, $2.20, $2.14, and $1.98. Based on these amounts, he calculated the "Estimated Unit Value" of the property to be "$2.00/SF." He then calculated the whole property's value prior to the taking: "3.50 ac (152,460 SF) X $2.00/SF = $304,920."

12

sales that had intended uses that were physically possible on the property—bank facilities, restaurants, automotive service facilities, and facilities for express lubes and self-service car washes. As to the impact of the pending highway project and taking, Smith testified that the combined use of a car wash and express lube might physically fit within the remainder property, but he disputed if the combined use would be financially feasible.[10] Smith testified that the State "intends to create a toll way at the Petropoulos property" that "affects the use of the property" and that the Petropouloses' property was to be a "mid-block" location on the toll road making development of "impulse retail" not financially feasible.[11]

The State contends that affirming the trial court's damage award will have an enormous impact on all governmental entities with the power of eminent domain because "[i]n every case where a remainder property is not damaged, but the property owner's opinion of value is greater than the government's opinion of value, the property owner will effectively recover damages based on nothing more than the mere difference between the property owner's value of the whole and the government's value of the remainder." The State fails to recognize, however, the evidence of

---

[10] Smith testified during cross-examination:

Q.    And are you aware that Bill Carson testified that the same uses that he drew
       in the whole property could also be physically fit on the remainder property?

A.    They may be physically possible.  I'm not sure that they would be accepted
       in the marketplace.

[11] Smith testified:

Q.    In your judgment, sir, is it financially feasible to develop impulse retail uses
       on a mid-block location on a toll [ ] road?

A.    No, I don't think that's the use that would go on.

damage to the remainder property from the taking. A reasonable fact-finder could have credited the experts' testimony that the property's zoning and development potential affected its market value, the uncontested testimony as to the market value of the remainder property after the taking based on a designation of LO use, and the Petropouloses' expert's testimony as to the obtainable zoning and highest and best use of the whole property before the taking to conclude that the remainder property's market value was damaged by the taking. *See City of Keller*, 168 S.W.3d at 807.

We conclude that the evidence was legally sufficient to support a finding that the remainder property was damaged by the taking, the jury's finding of $579,348 as to the market value for the whole property prior to the taking, and compensation in the amount of $303,178. *See id*. at 810; *see, e.g.*, *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) (jury has "discretion to award damages within the range of evidence presented at trial"). We overrule the State's first issue.

### *Jury Question on Value of Whole Property Prior to the Taking*

In its second issue, the State contends that the trial court erred in submitting a jury question which failed to state a proper legal measure of damages and in refusing the State's requested questions. The State contends that, because there was no evidence of any damage to the remainder property, the trial court should have partially directed the verdict and submitted the only disputed fact issue—the value of the part taken—to the jury. As an initial matter, because we have concluded that there was evidence of damage to the remainder property from the taking, we conclude that the trial court did not err in denying the State's motion for a partial directed verdict on the remainder property's damage from the taking. *Prudential Ins. Co.*, 29 S.W.3d at 77. We turn to a review of the trial court's charge.

14

The question that the trial court submitted to the jury was: "On November 22, 2002, what was the fair market value of the Petropouloses' entire tract of land, before the taking, excluding consideration of the proposed project and the pending condemnation?" The jury was instructed to answer in dollars and cents and was given definitions for fair market value and highest and best use.[12]

One of the State's proposed jury questions requested that the jury be asked to determine the difference between the value of the whole property before the taking and the remainder property after the taking:

> From a preponderance of the evidence, what do you find to be the damages, if any, to Defendant's property, including improvements thereon, as a result of the acquisition of the 0.33 acres (14,375 square feet) of land as of the date of taking, November 22, 2002?

---

[12] The trial court submitted the following definitions of fair market value and highest and best use:

> "FAIR MARKET VALUE" is the price the property will bring when offered for sale by one who desires to sell, but is not obligated to sell, and is bought by one who desires to buy, but is under no necessity of buying, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future. In determining the fair market value, you will consider the highest and best use of the property.
>
> * * *
>
> "HIGHEST AND BEST USE" means that legal use to which the property could have been adapted on the date of taking, or within the reasonably foreseeable future thereafter which was legally permissible, physically possible, financially feasible, and which would provide the owner with the greatest net return.

The State does not challenge these definitions.

In answering this Question, you are instructed that you shall determine such damages, if any, by considering the difference between (a) the value of the landowners' entire tract before the acquisition, excluding any influence of the project being constructed, and (b) the market value of the remainder after the acquisition, giving consideration only to the effect of the condemnation on the uses to which the condemned part is to be put.

The second part of the measure of damages that the State requested be submitted to the jury—the value of the remainder property after the taking—was not contested. Both parties relied on the State's expert Hornsby's testimony that the value of the remainder property after the taking was $276,170. Chris Petropoulos offered Hornsby's deposition testimony to establish the remainder property's value after the taking, and the State called Hornsby to testify as to the remainder property's value.

The only disputed fact then, under the State's proposed question and instruction, was the value of the whole property before the taking—the fact issue that the trial court submitted to the jury. *See* Tex. R. Civ. P. 278 ("The court shall submit the questions, instructions and definitions . . . which are raised by the written pleadings and the evidence. . . . A judgment shall not be reversed because of the failure to submit other and various phases or different shades of the same question."); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 223 (Tex. 1992) ("Only disputed issues must be submitted to the jury."); *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971) ("Submission of an issue on an undisputed fact is unnecessary."); *European Crossroads' Shopping Ctr., Ltd. v. Criswell*, 910 S.W.2d 45, 57 (Tex. App.—Dallas 1995, writ denied) ("When a party conclusively proves a vital fact or does not contradict a vital fact, its effect is a question of law and there is no

16

issue for the jury."). On this record, we cannot conclude that the trial court abused its discretion in its submitted jury question. *See Toles*, 45 S.W.3d at 263. We overrule the State's second issue.

***Value of Remainder Property***

In its third issue, the State contends that the trial court erred in partially directing a verdict on the market value of the remainder property because the value of the remainder property "standing alone" was not a material issue in the suit. But, the State agreed that a proper measure of damages was the difference between the value of the whole property before the taking and the value of the remainder property after the taking, and both parties relied on the State's expert Hornsby to establish the remainder property's market value after the taking. The only disputed fact issue under this measure of damages was the value of the whole property before the taking. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 223; *Sullivan*, 471 S.W.2d at 44. We conclude that the trial court did not err by finding the remainder property's market value as a matter of law. *See Prudential Ins. Co.*, 29 S.W.3d at 77.[13] We overrule the State's third issue.

***Effect of Jury's Answer on Ultimate Compensation***

In its fourth issue, the State contends the trial court erred in preventing the State from telling the jury the effect of its answer on the amount of compensation awarded in a condemnation case. The State agrees that a jury normally is not to be told the effect of its answers but argues that, because "the jury was given an improper charge that submitted to them only half of an issue, it would

---

[13] The State concedes in its brief that "it is true that the only evidence offered regarding the remainder property was that it had a value of $276,170."

17

have been appropriate for the State to be allowed to explain to the jury the other half of the equation." The State argues that the trial court's question "took away from the jury the determination of just compensation" for the taking. The State has failed to cite any authority to support its argument and we have found none. *See* Tex. R. Civ. P. 277 (trial court shall not "advise the jury of the effect of their answers"). We overrule the State's fourth issue.

*Expert Testimony*

In its fifth issue, the State contends that the trial court abused its discretion in denying its pre-trial motion to exclude the expert testimony of Smith because his testimony was not relevant or reliable and the admission of his testimony was reversible error. The State does not challenge Smith's qualifications as a real estate appraiser, but contends that Smith's testimony as to the value of the whole property was not relevant because the whole property's value was only relevant when compared to the remainder property's value and it was not relevant to the issue of whether the remainder property was damaged by the taking. The State also contends that Smith's testimony was speculative and not reliable because it was based on the market value of the property for a specific use, a car wash combined with an express lube facility, and not "the market value in view of any uses to which it is adapted," and "[n]o buyer has approached the Petropouloses about purchasing the property for use as a car wash/lube facility." The State also challenges the reliability of Smith's use of "price per bay" based on the specific use of a car wash combined with an express lube facility to reach his opinion that the whole property's market value was $630,000.

Texas Rule of Evidence 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702. Rule 702 imposes a "gatekeeper" obligation on the trial court to ensure relevance and reliability of expert testimony. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 722-26 (Tex. 1998). Once the party opposing expert testimony objects, the proponent bears the burden to demonstrate admissibility. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). The issue then is whether the Petropouloses met their burden to demonstrate that Smith's testimony was relevant and reliable.

### 1. Relevance

The relevance requirement for the admission of expert testimony "incorporates traditional relevancy analysis under Texas Rules of Evidence 401 and 402," and is met "if the expert testimony is 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002) (quoting *Robinson*, 923 S.W.2d at 556). Evidence that is relevant is admissible, *see* Tex. R. Evid. 402, and evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401.

The State contends that Smith's testimony of the value of the whole property "standing alone" was not relevant, but the State does not dispute that a party may rely on an opponent's witness to support an issue—as the Petropouloses did here. The Petropouloses offered the State's expert Hornsby's deposition testimony to establish the value of the remainder property

19

after the taking. Smith's testimony as to the whole property prior to the taking, therefore, was not "standing alone," and was relevant to the only disputed element of the measure of damages. *See Westgate*, 843 S.W.2d at 456-57 (measure of damages when part taken does not constitute separate economic unit and condemnation does not increase value of remainder property). Because the market value of the whole property prior to the taking was a fact of consequence to the determination of the disputed element of the measure of damages, we conclude that the Petropouloses met their burden to show that Smith's testimony was relevant. *See* Tex. R. Evid. 401, 402; *Zwahr*, 88 S.W.3d at 629; *Robinson*, 923 S.W.2d at 557.

### 2. Reliability

"The reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions." *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 254 (Tex. 2004). In reviewing the reliability of an expert's testimony, a court is not to determine whether the expert's conclusions are correct but "whether the analysis used to reach those conclusions is reliable." *Zwahr*, 88 S.W.3d at 629.

The State does not dispute that Smith generally utilized the comparable sales approach that has been "long favored" by the courts "when determining the market value of real property." *See Sharboneau*, 48 S.W.3d at 182. The State also does not dispute that Smith's comparable land sales were voluntary, took place near in time to the condemnation, occurred in the vicinity of the condemned property, and involved land with similar characteristics. *See id.* The focus of the State's reliability challenge is Smith's unit of comparison of "price per bay" and his utilization of land sales for the specific uses of car wash and express lube facilities.

20

Smith testified that he performed a "highest and best use study" on the whole property and to the measure for comparing properties, the unit of comparison:

> As an appraiser, what we do is highest—what we call highest and best use study. And that relates to four facets, what is legally permissible being the first, what's physically possible, the second, what's financially feasible, what use could go on that site that would make it feasible, a feasible use of that site. And then out of those three, out of the uses that are financially feasible, the—you find the use that is maximally productive to the site. And that's—that's the use that would provide the highest return to the land.

* * *

> A unit of comparison has to do with what is the best comparison from—taking from a sale that indicates what a reasonable buyer and seller—a seller would sell for and a buyer would pay in an arms-length transaction. And it could be anywhere from a price per square foot of just land area. It could be priced per square foot of a potential building area. It could be in—and that would usually be price per square foot, GBA, gross building area. It could be price per foot, whatever type use may go in that. It could be price per bay. It could be price per—in this case, we have a car wash, it could be per wash bay. And what—how does buyers in the marketplace actually, you know, how do they buy property, and what [ ] price that they pay, how does that correlate.

Smith provided data of comparable sales with a variety of possible uses for the property. Excerpts from his report that were admitted as exhibits included data from eighteen land sales, occurring between 1999 and 2003 with varied intended uses—branch bank, several types of restaurants, automotive services, express lube, and self-service car wash—that, in his opinion, were possible for the property. For each land sale that he compared, his supporting data included the intended use, the date of the sale, the sales price, the land area in square feet, the building area in square feet where applicable, the price per square foot based on the land area, and the price per

21

square foot based on the building area where applicable. The price per square foot based on the land area without adjustments for the land sales that he compared ranged from $2.75 to $17.05.

Smith testified that he performed a feasibility study on the possible uses for the property considering such factors as the impervious cover limitations. Smith testified that the land that could be developed on the property was not large enough for a branch bank, developing the land for a restaurant was feasible although the lack of sewer services limited this use on the property, and using the property for an automotive services facility was feasible but not the best use. He concluded, consistent with the opinion of the Petropouloses' expert Carson, that the best use was an express lube with combination self-service car wash.

Smith testified to his reasons for determining that "price per bay" was the best unit of comparison for the comparable sales with the intended use of a car wash or an express lube facility:

> [I]t takes out a lot of the uncertainty from the physical attributes or the regulatory restrictions. It takes out a lot of those variables because you narrow it down to what—what the buyer paid for a particular site for a use. . . . And so by—your unit of comparison can eliminate a lot of adjustments because it takes out some of the factors like topography or zoning. It eliminates some of those adjustments.

For the two land sales for express lube facilities, the prices per bay for the express lube facilities without adjustments were $161,667 and $138,333. For the three land sales for self-service car wash facilities, the prices per bay were $46,429, $68,750, and $43,833. Smith opined that the adjusted price per bay for an express lube facility for the property was $140,000, the adjusted price per bay for a self-service car wash facility for the property was $45,000, and that the whole property would

22

support three bays for an express lube facility and five bays for a self-service car wash facility to reach his estimated market value of $630,000.[14]

Although the State's experts provided conflicting testimony of the property's highest and best use as an office building and the property's market value based on four different land sales with a different unit of comparison, it was for the jury to resolve the conflicting evidence of the experts to determine the market value of the whole property prior to the taking. *See City of Keller*, 168 S.W.3d at 820 ("It is the province of the jury to resolve conflicts in the evidence."). We conclude that the Petropouloses met their burden to show that Smith's expert testimony was reliable and that the trial court did not abuse its discretion in admitting Smith's testimony. *See Zwahr*, 88 S.W.3d at 629 (court not to determine whether conclusions are correct); *Helena Chem. Co.*, 47 S.W.3d at 499 (trial court has broad discretion to determine admissibility of expert testimony); *Robinson*, 923 S.W.2d at 557.

As part of its fifth issue, the State contends that the trial court abused its discretion and that it is entitled to a new trial because the Petropouloses did not offer evidence to support that Smith's testimony was relevant and reliable at the pre-trial hearing on the State's motion to exclude. Although neither party offered evidence at the pre-trial hearing and there is no response to the State's motion to exclude Smith's testimony in the record, it is within a trial court's discretion whether to

---

[14] He calculated the estimated fair market value as follows:

| | | |
|---|---|---|
| Express Lube Facility | 3 Bays @ $140,000 per Bay = | $420,000 |
| Self-Service Car Wash Facility | 5 Bays @ $45,000 per Bay = | $225,000 |
| Estimated Market Value | | $645,000 |
| Less: Cost for Subdivision/Zoning | | ($15,000) |
| Estimated Market Value-Before the Taking-As Is Condition | | $630,000 |

hold a pre-trial evidentiary hearing when an expert's testimony has been challenged. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999) (trial court has "same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether* that expert's relevant testimony is reliable"). Further, in making a preliminary determination on the admissibility of the expert's testimony, the trial court is "not bound by the rules of evidence except those with respect to privileges." *See* Tex. R. Evid. 104(a).

On this record, we cannot conclude that the trial court abused its discretion in overruling the State's pre-trial motion to exclude Smith's testimony without conducting an evidentiary hearing.[15] Smith's qualifications were not challenged, and he generally utilized the "long favored" comparable sales approach for appraising real property. *See Sharboneau*, 48 S.W.3d at 182. Having concluded that the trial court did not abuse its discretion in admitting Smith's trial testimony, we also conclude that the State has failed to show that the trial court's pre-trial ruling denying the State's motion to exclude Smith's testimony affected a "substantial right" of the State. *See* Tex. R. Evid. 103(a); *Sharboneau*, 48 S.W.3d at 182. We overrule the State's fifth issue.

---

[15] The State cites *State of Texas v. Harrison*, No. 06-98-00007-CV, 1998 Tex. App. LEXIS 7668 (Tex. App.—Texarkana 1998, no pet.) (mem. op., not designated for publication), to support its argument that the trial court abused its discretion at the pre-trial hearing. We find that case distinguishable. Our sister court found that the trial court abused its discretion in denying the State's motion to exclude the property owners' expert because the property owners did not present any evidence to prove relevance and reliability at the "gate keeper" hearing. *See id*. at *7. In contrast to the procedural posture of this case, in *Harrison*, the trial court held an evidentiary hearing, the State attached its own expert's opinions to its motion to exclude, and the State's expert testified at the hearing. *See id*. at *3-5.

## CONCLUSION

Having overruled the State's issues, we affirm the judgment of the trial court.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Henson

Affirmed

Filed:   April 28, 2009