

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00307-CV

THE STATE OF TEXAS                                                    APPELLANT
                                                                   AND APPELLEE

V.

STOCKTON BEND 100 JOINT                                               APPELLEE
VENTURE, A TEXAS JOINT                                           AND APPELLANT
VENTURE

----------

## FROM COUNTY COURT AT LAW OF HOOD COUNTY
## TRIAL COURT NO. C05870

----------

## MEMORANDUM OPINION[1]

----------

This is an appeal from a judgment in a condemnation case. The State of

Texas instituted an eminent domain action to condemn property owned by

Stockton Bend 100 Joint Venture (Stockton) on Lake Granbury. Stockton

[1]*See* Tex. R. App. P. 47.4.

objected to the $215,028.00 award of the special commissioners, and the issue of compensation was tried to a jury. The jury awarded Stockton $1,128,277.00. In two issues, the State challenges the jury's award. In one issue on cross appeal, Stockton complains of the trial court's denial of its motion to dismiss the State's petition for condemnation. We overrule both of the State's issues and Stockton's cross appeal and affirm the trial court's judgment.

## I. Background

In 1996, Jim Makens and Tim Fleet purchased a 100-acre tract located on Lake Granbury (the Property) through Stockton. The Property was located on County Road 401, also known as Old Stockton Bend Road. Stockton created a plan to develop the land into a subdivision of single-family homes, and a plat reflecting the proposed development was subsequently approved by the City of Granbury. At the time the Property was platted in May 1997, it was platted for 113 single-family home lots plus a section for multifamily housing in the form of apartments or townhomes. Several of the home lots would back up to a creek that ran through the Property, a feature that was considered an amenity.

Stockton decided not to proceed with the development plan immediately, and in the interim years Makens and Fleet used the Property as a sort of weekend getaway for themselves and their families.[2] Stockton considered

---

[2]At the time of purchase, there was one residence on the Property. Later, Makens built a second home on the Property.

2

developing the Property in 2007 but again decided to wait because of the nationwide housing crisis.

## A. The Condemnation Proceedings

In June 2011, the State filed a petition for condemnation seeking to acquire 4.112 acres out of the Property for the construction of the Loop 567 Project, which would extend the existing Loop 567 to divert truck traffic out of downtown Granbury.  Exhibit A to the petition included a description of the lands sought to be condemned[3] and a survey map of the plans for Loop 567.  The survey map contained a double hash mark on a line demarking the border of the State's right-of-way on the west side of the Property.  The metes and bounds description included a note that stated, "Access is prohibited across the 'Denial of Access Line' to the highway facility from the remainder of the abutting property," and the last page of Exhibit A to the petition included an Access Addendum that stated:

ACCESS ADDENDUM

Notwithstanding the statement on page 2 of the foregoing property description that "Access is prohibited across the 'Denial of Access Line' to the highway facility from the remainder of the abutting property", no "Denial of Access Line" is described therein and, therefore, access [is] not denied to the highway facility from the remainder of the abutting property.

---

[3]The State took approximately 1,623 feet of property frontage by 128 feet of depth.

The shaded area below represents the land condemned by the State:



At the hearing on September 6, 2011, the Special Commissioners awarded Stockton $215,028.00. Stockton filed objections to the award, and the Commissioners' Award was deposited into the trial court's registry on October 11, 2011, which became the date of acquisition for purposes of valuing the property.

### 1. Stockton's arguments at trial

At trial, Stockton argued that the value of the remainder after the taking was diminished for the following reasons: (1) a grade differential of seven to ten feet between the Old Stockton Bend Road and the new Loop 567; (2) an unsafe driveway grade due to the higher elevation of Loop 567; (3) drainage problems

4

resulting from the State's replacement of a 48-inch culvert pipe with four five-by-ten feet and one six-by-ten feet concrete box culverts; (4) driveway spacing requirements which would limit the amount of driveways Stockton could build to access Loop 567; and (5) ambiguous and confusing access language in Exhibit A to the State's condemnation petition and exhibits attached thereto referring to a "denial of access" resulting in "a potential detriment to selling the property." Stockton presented four witnesses to testify to these damages: Makens, Fleet, a certified engineer named Richard Perkins, and a real estate appraiser and broker named Jamie Wickliffe.

### i. Jim Makens

Makens testified that Loop 567 was seven to ten feet higher in grade than the Old Stockton Bend Road. Whereas Old Stockton Bend Road was about level with the Property, the Loop 567 extension created a significant slope in the driveway connecting the Property to the new road.[4] While Makens added more gravel to elevate the driveway in an effort to make it safer, Makens testified that the driveway into and out of the Property was still more difficult to maneuver and unsafe. The steep driveway, combined with a hill on Loop 567 a few hundred feet to the south, reduced the visibility of oncoming traffic from the south when a driver exited the Property. Makens also testified that Loop 567 makes the Property a less desirable subdivision because it now abuts a busy highway rather

---

[4]The jury viewed photographs depicting the difference in elevation between the Old Stockton Bend Road and the new Loop 567 during construction.

5

than a calm country road. He also testified that the increased noise from traffic on the highway would be a detriment to the property.

During the Loop 567 Project, the State replaced one 48-inch culvert pipe that had run underneath Old Stockton Bend Road with five large[5] box culverts that run underneath Loop 567. Makens testified based on his experience in developing properties that the velocity of the water flowing through the new culverts would increase by over 300% in comparison to the velocity of water that flowed through the old 48-inch pipe. Makens opined that the increased velocity of water flow would cause significant erosion and would extend the water flow more than five hundred feet into the remainder, rendering the area unusable for residential lots in the future.

Makens also testified that while Granbury's zoning regulations required the Property to have one driveway for every fifty lots within the subdivision, TxDOT regulations would restrict the Property to only one driveway accessing Loop 567.[6] According to Makens, the construction of a driveway would require the use of additional land from the Stockton property to build a soft slope for cars entering

[5]Four of the box culverts were ten feet long and five feet tall and the fifth was ten feet long and six feet tall. Stockton and its neighbor requested the slightly taller box culvert to allow cattle to pass beneath the new road.

[6]At the time of trial, Stockton had not requested any permits for additional driveways. Makens testified that based on his prior experience developing lots and dealing with the Texas Department of Transportation (TxDOT), he expected any such permit to be denied because any new driveway would be unsafe under TxDOT's regulations.

6

the subdivision from the highway and a designated turn lane off the shoulder of the highway to provide space for cars to decelerate before entering the driveway. Makens testified that due to all of these factors, the 113 lots could no longer be developed pursuant to the original plat.

In addition, the language in Exhibit A of the State's petition for condemnation also caused problems for a future sale or development of the land, according to Makens. In his opinion, the denial of access symbol on the plat and the language denoting a "Denial of Access Line" created an ambiguity that would deter potential buyers.[7]

Makens testified that the value of the Property prior to the taking was $60,000 an acre, totaling $6,000,000. He estimated the value of the property taken by the State to be $247,000 and the value of the remainder property to be $2,301,000, 40% less than it was prior to the taking. In total, he estimated Stockton's total damages post taking to be $2,548,032.

### ii. Tim Fleet

Co-owner Tim Fleet's testimony was similar to that of Makens, but Fleet's background and experience in developing properties in the Granbury area was more extensive than Makens's. His pre taking and post taking estimates of the value of the land mirrored Makens's estimates.

---

[7]Makens testified that in his opinion, the "Access Addendum" did not cure this problem.

### iii. Richard Perkins

Perkins, a civil engineer who testified as an expert witness on behalf of Stockton, was retained to look into three issues related to the State's condemnation: (1) the effect of the box culverts that replaced the 48" drainage pipe; (2) the effect of access to the Property caused by the new Loop 567; and (3) the effect on any future driveways built to access the Property, specifically with regard to the necessity of raising the elevation of any driveway to access Loop 567 and comply with safety requirements of TxDOT.

In arriving at his opinion, Perkins testified that he relied upon a hydraulic study performed by the engineering firm Parsons Brinckerhoff on behalf of the State which evaluated the effect of the culverts' design on the Property. Perkins testified that the new culverts, which were approximately twenty times the size of the old 48-inch pipe, would cause the water velocity to be "considerably larger" than what it had been through the old pipe. According to Perkins' estimates, the velocity increased from approximately 3.9 cubic feet per second to 11.46 cubic feet per second, and the runoff water would not dissipate to the pretaking velocity of 3.9 cubic feet per second until it was 509 feet from the culverts. Perkins testified such an increase in velocity generally produces an erosive effect on the downstream property,[8] and Stockton would be unable to develop this area

---

[8]When a large rainstorm occurred in the past, excess water would build up on the west side of the road because the 48-inch pipe couldn't handle that amount of water flow. On occasions when the water build up flooded the

8

because of the erosive effect. According to Perkins, the expanded box culverts caused the Stockton property to lose 22,514 square feet of land to drainage due to the increased velocity of water.

Perkins also estimated that Loop 567 is between five and six feet higher than the existing driveway to the Property and in some locations along the Property frontage, the roadway is higher than that. This increase in elevation, according to Perkins, rendered the current condition of the driveway unsafe. The slope of the driveway approach, which Perkins testified was now a 3-to-1 slope, would not only be difficult to mow but would also place an outbound vehicle at such an angle that it could not get an adequate view of oncoming traffic. According to Perkins, TxDOT's safety regulations did not permit driveways to be installed on a 3-to-1 slope, so in order to make the driveway safe, Stockton would need to add substantial fill material in order to build up the driveway approach and decrease the slope and also to prevent erosion over time that would make the driveway increasingly dangerous. This installation of fill material would encumber more area than was needed prior to the taking for the driveway. Because a portion of this project would lie within the right-of-way of Loop 567, Stockton would have to obtain approval from TxDOT to be able to make the driveway safe in this manner.

---

roadway, it would not be concentrated because it would spread out across the road in what Perkins referred to as "sheet flow."

Based on Perkins's review of the TxDOT Access Manual regarding standards for speed and safety of vehicles traveling on roadways and spacing requirements for driveways, Perkins concluded that construction of a driveway would not be permitted on 524 feet of Stockton's frontage because it would be located on a curve of the road;[9] thus, the remaining frontage would allow for only one driveway in compliance with TxDOT standards.[10]   Perkins also identified other factors which precluded building more than one driveway, including: (1) an electric easement and a guy wire easement that ran through the property, (2) the culvert installed by the state, (3) TxDOT spacing requirements, (4) the slope into the property from the road, (5) a nearby driveway on an adjacent property, and (6) the need for Brazos Electric to have driveway access.  Perkins concluded that because Stockton could only fit one driveway along the Loop 567 frontage, any future development was limited to developing fifty lots.

Perkins also reviewed the language of the State's petition for condemnation and the Access Addendum, a situation he testified he had never encountered before, and opined that the addendum did not clear up any ambiguity resulting from the denial of access notation appearing in Exhibit A to the petition.

---

[9]Prior to the taking, the curve was not there.

[10]According to Perkins, the TxDOT standards provided that driveways installed along a highway with a speed equal to or greater than 50 miles per hour must be a minimum of 425 feet apart.

### iv. Jamie Wickliffe

Jamie Wickliffe, a real estate appraiser and broker, also testified on behalf of Stockton. Wickliffe concluded the highest and best use of the property prior to the taking on October 11, 2011, was for single family residences and as an investment for development. She valued the property at $7,229,729.00 as of October 11, 2011. She valued the 4.112 acres and the improvements thereon taken by the State at $306,406.00. In re-valuing the Property after its taking, Wickliffe took into account several factors, including the change in elevation of Loop 567 compared to Old Stockton Bend Road. Wickliffe noted that the elevation change created a safety hazard that made egress from the Property more difficult because of impaired visibility of oncoming traffic and diminished ability to accelerate onto Loop 567. She also noted the effect the new elevation had on the physical characteristics of the Property—after the taking, a driver passing the Property looked down on the Property, not across the Property—as well as the effect the elevation change would have on drainage. Wickliffe reviewed the State's petition and testified that the State's ambiguous references to access found in Exhibit A could work as a red flag to deter future buyers. Wickliffe voiced concerns that there were no assurances that additional driveways would be possible, which also limited the development possibilities for the Property. Wickliffe concluded that the highest and best use after the taking was a diminished single family residence with fewer development options than existed before the taking. She valued the Property post taking at $6,063,500.00,

11

and calculated a difference of $859,344.00 from the pre taking value, or an approximate 12 percent decrease. In addition to the value of the land taken by the state ($306,406.00), Wickliffe estimated Stockton's damages to be $1,165,750.00.

### 2. The State's arguments

The State presented three witnesses in its case-in-chief: Jerry Hunter, a design specialist with TxDOT; David Fowler, a hydrologist for TxDOT; and Jeff Tillman, a real estate appraiser.

### i. Jerry Hunter

Jerry Hunter, a design specialist for TxDOT in the Fort Worth district, identified himself as the primary person working on the roadway design for Loop 567. According to Hunter, there was no denial of access along the Property's frontage.[11] Hunter testified that while the driveway entering the Property before the taking was restored to the same location, Stockton could have requested that it be moved to a different location. Furthermore, Hunter added, Stockton could request TxDOT to perform additional work to the portion of the driveway on the State's right-of-way if Stockton was unhappy with it after the taking. But, according to Hunter, he was unaware of any request by Stockton to perform such additional work after the driveway was completed. Hunter testified that the

---

[11]Hunter testified that a denial of access notation means that there would be no private driveways permitted to be constructed along the roadway, only additional public access roads.

12

difference in elevation from the center of the roadway to the edge of the State's right-of-way was 2.8 feet. He testified that the slope was a 5.3 percent slope, which, in his opinion, is not an unsafe slope for a driveway.[12] Hunter admitted that part of the original plans for the Loop 567 Project was to replace and asphalt the existing driveways, but as of the time of trial, that had not occurred.

### ii. David Fowler

David Fowler, a hydrologist for TxDOT, also testified on behalf of the State. While part of his job involved granting and denying access permits for TxDOT, Fowler also provided testimony regarding the culvert. Fowler disagreed with Perkins's assertion that the redesigned and larger culverts significantly changed the drainage to the Property. Fowler also disagreed somewhat with Perkins's calculations, testifying that the change in velocity was actually 11.46 to 8.75 cubic feet per second. Fowler was critical of Perkins's reliance on the Parsons Brinckerhoff study because he believed the elevations used in the study were inaccurate.

### iii. Jeff Tillman

Real estate appraiser Jeff Tillman was hired by TxDOT to appraise the Property, and he testified on behalf of the State. Tillman opined that the entire property had a value of $43,124.00 per acre, and he valued the 4.112 acres acquired by the State at $177,300.00. Tillman found no damages to the

---

[12]While TxDOT allows for driveways up to a 12 percent slope, he strives to keep them at 10 percent or less.

13

remainder but determined that it would cost $30,500.00 to re-fence the right of way, and thus arrived at a total compensation of $207,800.00.

### 3. The Jury's Verdict

The jury awarded $284,912.00 for the property acquired by the State and $843,365.00 in damages to the remainder property, for a total award of $1,128,277.00.

## II. Discussion

The State brings two issues on appeal. The first issue is whether Stockton may recover damages arising out of an impairment of access without a showing of material and substantial impairment of access. The State's second issue is whether there was any competent evidence to support the jury's award of $843,365.00 in damages to Stockton's remaining property.

In its cross appeal, Stockton argues that the trial court abused its discretion in denying Stockton's Original Motion to Dismiss and Plea to the Jurisdiction because the State took more property than was described in its petition for condemnation. Because it concerns the issue of jurisdiction, we first address Stockton's cross appeal.

## A. Stockton's Cross Appeal

Stockton brings a single issue in its cross appeal, arguing that the trial court abused its discretion in denying its Original Motion to Dismiss and Plea to the Jurisdiction. Stockton specifically argues that the State acquired more property than it described in its petition for condemnation and therefore the trial

14

court lacked subject matter jurisdiction over the property that was taken but not described in the petition.[13]

A plea to the jurisdiction is a dilatory plea that is unconcerned with the merits of the asserted claims. *Mission Consol. Ind. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). Such a plea challenges the trial court's power to adjudicate a case, and the burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction. *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 149–50 (Tex. 2012). Whether a trial court has subject matter jurisdiction is a legal question that we review de novo. *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002). In doing so, we review the parties' pleadings, any evidence submitted to negate the existence of jurisdiction, and any evidence necessary to resolve the jurisdictional issue. *Heckman*, 369 S.W.3d at 150.

The issue of damages associated with the State's purported drainage plan was discussed by witnesses on both sides at the special commissioners' hearing in September 2011. At that hearing, the State admitted initially it had not evaluated the amount of water that the change in the drainage structure would

---

[13]The State has argued that Stockton waived any such argument by withdrawing the special commissioners' award. The evidence, however, showed that the Parsons Brinckerhoff study as to the drainage issues was not issued until after the special commissioners' award was withdrawn and the actual effect of the drainage change was not known until after the culverts were constructed. In overruling Stockton's cross appeal, we assume without deciding that Stockton did not waive this issue.

force onto the Property, but after Stockton withdrew the Commissioners' award, the State performed a hydraulic analysis on the planned drainage structure, which resulted in the issuance of the Parsons Brinckerhoff report. Stockton argues, nevertheless, that the actual construction of the five-barrel drainage culverts increased drainage by 40% more than had been recommended by the State's own hydraulic report.[14] Because of the increased width and erosive velocity of the stormwater flow, Stockton argues, the State had "taken an additional minimum of 17,541 square feet to 27,486 feet (509 feet by 54 feet) of the Property for drainage purposes," and Stockton argues that the failure to include this additional taking in the State's petition deprived the trial court of jurisdiction.[15]

The description-of-property requirement in section 21.012 of the property code is jurisdictional. *See Aquila Sw. Pipeline Corp. v. Gupton*, 886 S.W.2d 497, 501 (Tex. App.—Houston [1st Dist.] 1994, no writ). However, in the trial court's

---

[14]Stockton argues that the pre condemnation downstream velocity measured 3.87 feet-per-second (fps) and the post condemnation velocity measured 11.46 fps, and did not dissipate back to 3.87 fps until it flowed approximately 534 feet downstream of the new structure.

[15]The trial court initially granted Stockton's motion to dismiss, indicating at the hearing that because the State could not amend its petition "to include the additional property that's the remainder that's claimed to be taken by the drainage," dismissal was the correct remedy. But upon reconsideration requested by the State, the trial court denied the motion to dismiss on July 9, 2013. Stockton petitioned this court for mandamus review and we denied the petition. *In re Stockton Bend 100 Relator Joint Venture*, No. 02-13-00368-CV, 2013 WL 5874581, at *1 (Tex. App.—Fort Worth Oct. 31, 2013, orig. proceeding) (mem. op.).

de-novo review, which was implicated by Stockton's objections, it may consider new compensation facts or compensation issues. *See PR Invs. & Specialty Retailers, Inc. v. State*, 251 S.W.3d 472, 477–78 (Tex. 2008) (holding that a court does not lose jurisdiction when material facts pertaining to damages change). Rather, when a condemning authority changes its plans after the condemnation process is completed, "the owner of the remaining property [is left] to pursue a claim for inverse condemnation if the value of that property is diminished." *Id.*

The *PR Investments* decision is instructive. *Id.* In that case, TxDOT changed its plans for the condemned property after the special commissioners' hearing but before the trial court proceeding. *Id.* The trial court granted the landowner's motion to dismiss the case because it found that it lacked jurisdiction to proceed. *Id.* at 474. The supreme court reversed, holding that the pretrial change in plans did not deprive the trial court of jurisdiction to hear the case. *Id.* at 476 ("There is no requirement that, for the trial court to retain jurisdiction over a condemnation case, all material facts relevant to damages must remain static after the special commissioners have ruled."). It went on to say:

> In sum, the relevant statutes and case law do not require TxDOT to specify in its petition the precise signs, striping, lanes, and the like that it intends to construct when it condemns property for road construction. Nor is TxDOT prohibited from changing those design specifics after the special commissioners' hearing, even if the change of plans will affect the value of the property owner's remaining tract. Such a change of plans does not divest the trial court of jurisdiction to proceed after the special commissioners have ruled and to "try the case in the same manner as other civil causes." In these circumstances the statutory scheme does not require TxDOT to start over with a new petition, a new hearing before the

17

special commissioners, and payment to Petitioners of all the fees and expenses they incurred in the first administrative proceeding.

*Id.* at 478–79.

The State petitioned to condemn a specific tract of land—4.112 acres of the Property. At the special commissioners' hearing, Stockton was aware of the possible effect of drainage on the Property as a result of the change in the drainage structure. Based on the State's plan for the land and the actual construction of the drainage culverts, Stockton discovered that its remaining land's value would be diminished by increased drainage and erosion. Although Stockton attempts to argue that this diminished value means the State actually condemned more property than was described in the petition, it did not bring a counterclaim for inverse condemnation. *See, e.g.*, *City of Houston v. Carlson*, 451 S.W.3d 828, 831 (Tex. 2015) ("Where a property owner believes compensation is due, he may seek redress via an inverse-condemnation claim.") (citing *State v. Hale*, 146 S.W.2d 731, 735 (Tex. 1941)). The effect of the State's construction of Loop 567 on the surrounding property did not implicate the trial court's subject matter jurisdiction, and the trial court's denial of Stockton's motion to dismiss was proper. We overrule Stockton's cross appeal.

## B. The State's Appeal

The State first argues that by mischaracterizing Stockton's damages as damages for "unsafe access," Stockton was improperly awarded denial of access damages to the remainder of Stockton's property. Second, the State argues that

18

there was no evidence, or in the alternative, insufficient evidence to support the jury's award of $843,365.00 in remainder damages.

## 1. Denial of access

The State argues that in order to recover damages for denial of access, Stockton was required to show that any denial of access was material and substantial as a matter of law and that prior to trial the trial court was required to make a finding of material and substantial denial of access. In response, Stockton argues that it did not seek damages associated with a denial of access.

To determine whether this case presents a claim for impairment or denial of access, as the State claims it does, or if it presents a claim for diminished value to the remainder as a result of unsafe access, as Stockton claims, we must look to precedent regarding eminent domain in Texas.

The United States and Texas constitutions require governments to compensate landowners for taking their property for a public use. U.S. Const. amend. V (requiring just compensation when the government takes private property for public use); Tex. Const. art. I, § 17(a).[16] When only part of a

---

[16]The property code provides for condemnation damages as follows:

If a portion of a tract or parcel of real property is condemned, the special commissioners shall determine the damage to the property owner after estimating the extent of the injury and benefit to the property owner, including the effect of the condemnation on the value of the property owner's remaining property.

Tex. Prop. Code. Ann. § 21.042(c) (West 2014).

19

landowner's property is taken, adequate compensation is required both for the part taken and for any damages to the remainder. *State v. Schmidt*, 867 S.W.2d 769, 772 (Tex. 1993), *cert. denied*, 512 U.S. 1236 (1994); *Coble v. City of Mansfield*, 134 S.W.3d 449, 454 (Tex. App.—Fort Worth 2004, no pet.). The proper measure of compensation damages when only a portion of a tract is taken for public use is the market value of the part taken and the difference between the market value of the remainder property immediately before the condemnation and the market value of the remainder property immediately after the condemnation, taking into consideration the nature of any improvements and the use of the land taken. *Coble*, 134 S.W.3d at 454.[17]

"'Whether property has been 'damaged' under the constitution is a question of law' subject to de novo review without deference to a lower court's conclusion." *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (citing *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996)). The trial court must determine if the damages claimed are compensable as a matter of law and then admit evidence accordingly. *Id.* We review the trial court's decision to admit or exclude evidence for abuse of discretion. *Id.*; *see also City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *Gee v. Liberty Mut. Fire Ins. Co.*,

---

[17]Market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *State v. Ledrec, Inc.*, 366 S.W.3d 305, 310 (Tex. App.—Fort Worth 2012, no pet.) (citing *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001)).

20

765 S.W.2d 394, 396 (Tex. 1989). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

Courts should admit as market-value evidence such matters as suitability, adaptability, surroundings, conditions before and after, and all circumstances which tend to increase or diminish the remainder's market value. *Coble*, 134 S.W.3d at 454; *State v. Carpenter*, 89 S.W.2d 194, 200 (Tex. 1936), *disapproved of in part on other grounds by State v. Meyer*, 403 S.W.2d 366 (Tex. 1966). A condemnee "may recover damages which are reasonably foreseeable, and [the condemnee] may show the reasonably probable uses of the tract taken that are calculated to depress the value of the remainder tract and thus enhance the recovery of damages." *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex. 1972). Damages due to required modifications to the remainder as a result of the condemnation, or damages due to a loss of improvements on the remainder because of the condemnation may, on a proper showing, be compensable. *State v. Centennial Mortg. Corp.*, 867 S.W.2d 783, 784 (Tex. 1993) (holding that evidence of costs of modifications to a condemnee's remainder property that

21

were required as a result of the condemnation was admissible to show a decrease in market value), *cert. denied*, 513 U.S. 812 (1994). But evidence "relating to remote, speculative, and conjectural uses, as well as injuries, which are not reflected in the present market value of the property" is not admissible and should be excluded. *Schmidt*, 867 S.W.2d at 773; *Tex. Elec. Serv. Co. v. Campbell*, 336 S.W.2d 742, 745 (1960); *Coble,* 134 S.W.3d at 455.

Not all condemnation damages are compensable. *See Schmidt*, 867 S.W.2d at 781 (holding that damages for decrease in market value due to traffic diversion, increased circuity of travel to the property, lessened visibility to passersby, and the inconvenience of construction activities were noncompensable when they were considered community injuries). And while the supreme court has clearly held that damages for impaired access to remainder property is a compensable special injury only if a material and substantial impairment of access exists as a matter of law, it has also held that "costs to mitigate damage or move existing driveways or other improvements may be compensable even if impaired access is not." *Cty. of Bexar v. Santikos*, 144 S.W.3d 455, 460–61 (Tex. 2004) (citing to *Interstate Northborough P'ship*, 66 S.W.3d at 217); *see also State v. Delany*, 197 S.W.3d 297, 299 (Tex. 2006). *Interstate Northborough* makes clear to us that a finding of material and substantial impairment of access is not necessary in the latter situation. 66 S.W.3d at 224.

22

In *Interstate Northborough*, the supreme court held that there was no material and substantial impairment of access and that the trial court had erred in finding that there was. *Id.* Even so, the landowners were entitled to recover damages related to the unsafe access resulting from the State's taking and the cost to cure such unsafe access. *Id.* In that case, the condemnation had made two of the five driveways leading to the office building on the remainder property unsafe by significantly shortening their length. *Id.* The situation was exacerbated by the fact that the frontage road's traffic typically exceeded the speed limit, thus making the shortened driveways even more dangerous. *Id.* Even further, the retaining wall built by the State worsened the unsafe conditions by impairing drivers' views of oncoming traffic. *Id.* The supreme court held that the landowner's unsafe-access and cost-to-cure evidence supported specific damages that were recoverable. *Id.*

On the other hand, in the *Santikos* and *Delany* cases, the supreme court held that because the impairment of access was not material or substantial the landowners could not recover for alleged unsafe access. In *Santikos*, the supreme court observed that the increased elevation of the frontage road after the taking only affected approximately 10 percent of the landowners' frontage to the highway and that the property was undeveloped at the time of the taking. *Santikos*, 144 S.W.3d at 457. No driveways or other improvements needed to be moved or modified in that case. *Id.* As the court noted,

23

> [T]he only claim is that someday a developer might want to build a driveway at the single most difficult and expensive location on the entire property. There may be cases in which access to raw land is materially and substantially impaired by a road project, but as a matter of law there is no such impairment in this case.

*Id.*

Following the reasoning in *Santikos*, the supreme court in *Delany* held that there was no material nor substantial impairment of access to a portion of raw land because reasonable access remained and it was "not damaged simply because hypothetical development plans may have to be modified." 197 S.W.3d at 300. In reaching that conclusion, the court noted that the landowner was entitled to construct a driveway "precisely where" a previous connector road had once run to the property.[18] *Id.*

In this case, the trial court did not make a finding that there was a material or substantial impairment in access prior to trial. When requested to do so by the State, the trial court stated, "If I understand, they're not even talking about a material and substantial access issue. They're talking about damages not even related to that. They're talking about the damages for the modifications that they're going to need to make to get access to the property, if I understand right."

We agree with the trial court that a finding of material and substantial impairment was not necessary in this case because the facts of this case are more analogous to *Interstate Northborough* than to *Santikos* or *Delaney*. Like

---

[18]At trial, the State conceded that it was bound to grant the landowners a driveway permit, even though the landowners had never requested one. *Id.*

24

*Interstate Northborough*, at issue in this case is the unsafe access resulting from the condemnation and the costs to remedy that unsafe access, as well as the impact of the unsafe access on the value of its remaining property. *See* 66 S.W.3d at 224. Unlike the landowners in *Delaney* and *Santikos*, the development plans at issue here—having been created by Stockton and approved by the City of Granbury—are more than hypothetical. And as this court has previously noted, *Delaney* "does not stand for the proposition that a landowner may *never* recover for damages to unimproved property based on problems for and restrictions on development created by a taking and affecting the property's market value." *Crosstex DC Gathering Co., J.V. v. Button*, No. 02-11-00067-CV, 2013 WL 257355, at *7 (Tex. App.—Fort Worth Jan. 24, 2013, no pet.) (mem. op.). As we observed in that case, the supreme court has stated:

> Generally, it may be said that it is proper as touching the matter of the value and depreciation in value to admit evidence upon all such matters as suitability and adaptability, surroundings, conditions before and after, and all circumstances which tend to increase or diminish the present market value.

*Id.* (citing *Carpenter*, 89 S.W.2d at 200). In *Crosstex* we held that the landowners' damages theory did not hinge upon impaired access to the property but instead was premised on an argument that because of the condemnation of their land for a pipeline easement, "development of the remainder property would be more complicated and that even though part of the property had a highest and best use for commercial development, the market potential for commercial

25

development had been negatively affected by the easement, and the market value of the property was decreased thereby." *Id.* at *9.[19]

We therefore conclude that the trial court did not err in failing to find as a matter of law that Stockton's access was materially and substantially impaired because Stockton's arguments and evidence related to the unsafe driveway access resulting from the taking and its effect on the value of the remainder property.

### 2. Sufficiency of the Evidence

In its second issue, the State argues that there was no evidence or, in the alternative, insufficient evidence to support the jury's answer to Question No. 2 awarding remainder damages of $843,365.00.[20]

---

[19]We disagree with the State's assertion, in reliance on *Heal*, 917 S.W.2d at 9, that the trial court's failure to find a material and substantial impairment should result in an implied or de facto finding. *Heal* pre dates *Interstate Northborough*, which differentiates situations in which the damages are related to unsafe access. 66 S.W.3d at 224. Because we hold that this case is analogous to *Interstate Northborough*, a conclusion that a material and substantial impairment of access occurred is not necessary to support the judgment and therefore a de facto or implied finding does not result simply because the trial court submitted damages issues to the jury. *See id.*

[20]Question No. 2 read as follows:

From a preponderance of the evidence, what do you find to be the damages, if any, to the landowner's remaining property caused by the acquisition of the 4.112 acres, as of the date of valuation, October 11, 2011?

You are instructed that in determining damages, you should consider the difference between (a) the fair market value of the

26

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal

---

landowner's remainder tract before the acquisition, and (b) the fair market value of the remainder after the acquisition.

ANSWER IN DOLLARS AND CENTS, IF ANY: $843,365.00

The State did not object to this question as given in the charge.

27

effect, is no evidence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

While the State baldly asserts that the only evidence introduced at trial supporting remainder damages constituted noncompensable damages, consistent with the position it took with the trial court, the State fails to articulate, specify, or isolate one piece of evidence admitted at trial that it alleges was "noncompensable." Instead, throughout the trial and on appeal, the State objects to whole portions of evidence with a broad objection that such evidence "includes

28

noncompensable items and injuries."[21]  In Appellee's brief, on the other hand, Stockton points to ample evidence in the record of compensable damages supporting Stockton's position that the Property's value was diminished due to burdens imposed upon it by the taking, including, among others, a driveway grade difference that, without substantial and expensive reconstruction, would result in unsafe access in and out of the Property, along with drainage, erosion and flooding problems caused by the replacement of the original 48" diameter culvert pipe with five concrete box culverts—four five-by-ten feet and one six-by-ten feet—an alteration that increased the velocity of the water flow over the Property by 300%.[22]

---

[21]Although the State's second issue is couched in terms of both a factual and legal sufficiency challenge, after stating the appropriate and correct standard of review and before reciting its prayer for relief, the State appears to limit its argument to a legal sufficiency challenge, and, excluding citations, offers us but three sentences to support its position:

> Incompetent evidence is legally insufficient to support a judgment.  The only evidence supporting remainder damages is evidence of noncompensable damages.  Not only was Stockton's testimony of access denial incompetent, the other complaints of increased noise and elevation change are also noncompensable.

[Citations omitted.] Such a succinct argument simplifies and narrows our analysis considerably.  We nonetheless, in the interest of justice, consider both the legal and the factual sufficiency of the evidence in our analysis.

[22]Perkins, in particular, testified extensively to the drainage problems and erosion caused by the State's decision to replace a 48-inch pipe with five large box culverts that were approximately twenty times larger than the pipe.  Based on the Parsons Brinckerhoff study, Perkins estimated that the significant increase in size of the culverts would increase the velocity of water flowing through the culverts from 3.9 cubic feet per second to 11.46 cubic feet per second and that

the velocity of the runoff water did not dissipate to 3.9 cubic feet per second until it was 509 feet from the culverts. According to Perkins, this increase in velocity would likely produce an erosive effect on the downstream property, rendering the area undevelopable and causing Stockton to lose 22,514 square feet of land to drainage.

Makens also testified to the damage caused by the increased drainage from the larger culverts, estimating that the water velocity flowing through the culverts would increase by over 300%. According to Makens, this would extend the water flow more than five hundred feet into the remainder and render undevelopable the area that was previously desirable for development because it backed up to a creek. The State does not now contest this testimony of the effect of increased drainage or argue that it cannot support the jury's verdict. Nor does the State argue that Perkins's or Wickliffe's testimony as expert witnesses was conclusory or speculative such that it would constitute no evidence. *See Coastal Transport Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) ("Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of material fact 'more probable or less probable.'") (citing Tex. R. Evid. 401).

The State instead argues that testimony regarding increased noise and elevation change caused by Loop 567 is noncompensable and therefore cannot support the judgment. It is true that Makens and Fleet testified to the effect of increased noise and elevation on the Property. But Makens and Fleet also estimated the remainder damages to be $2,301,000.00—more than two-and-a-half times the $843,365.00 awarded by the jury. And Wickliffe's discussion of the effect of the elevation of Loop 567 also does not serve to invalidate the jury's findings—Wickliffe testified that her valuation of the damages to the remainder was based upon a number of factors, including the unsafe ingress and egress to the remainder, drainage issues, potential future complications when selling the Property presented by the language in the State's petition, and the effect of regulations regarding driveway spacing. Wickliffe estimated the value of the remainder post taking to have decreased by $859,344—almost $16,000 less than the jury's award of $843,365.00 for damages to the value of the remainder. Any testimony to the increased noise and elevation change caused by Loop 567 does not eliminate the significant evidence of other damages to the Property, including the evidence of drainage issues caused by the installation of larger culverts. *See, e.g.*, *Lin v. Houston Community College System*, 948 S.W.2d 328, 337 (Tex. App.—Amarillo 1997, writ denied) ("In a condemnation case, the jury is allowed to set the value at any amount between the lowest and the highest value the expert witnesses put in evidence."); *Housing Authority of City of Galveston v. Henderson*, 267 S.W.2d 843, 846–47 (Tex. App.—Galveston 1954, no writ)

Furthermore, as Stockton points out, for a variety of legal reasons, which will be discussed below, the State preserved no error in the admission of damage evidence.

The State responds by pointing us to five instances where the State contends it preserved this point of error for our review. We agree with Stockton that the State failed to preserve error in all five instances.

First, the State claims it preserved error through argument related to its motion in limine. The State argues that its limine motion was treated and ruled upon as a motion to exclude evidence of "restriction of access that is not material or substantial as a matter of law." But an order denying a motion in limine preserves nothing for review. *Pool*, 715 S.W.2d at 637.[23]

Second, the State claims that its "offer of proof" following the testimony of Makens, Wickliffe, and Fleet preserved error. The State misapplies rule of evidence 103. Because the error the State complains of is one of admitting evidence, rather than one of excluding evidence, an offer of proof is not the proper method to preserve error. *See* Tex. R. Evid. 103(a)(2) (providing that "if

---

(holding evidence was sufficient to support award of damages where the evidence could have authorized a larger verdict than the one rendered).

[23]Further, the State's argument ignores the trial court's express statement to the contrary. In response to the State's characterization of the trial court's ruling as "a legal conclusion that the land is materially and substantially denied access," the court replied, "I'm not making that finding. I'm just denying that limine right now."

31

the ruling excludes evidence," a party preserves a claim of error when it informs the court of the substance of the evidence by an offer of proof).[24]

Third, the State contends that it preserved error through its motion to exclude and strike evidence following the testimony of Makens, Wickliffe and Fleet. This attempt to preserve error in this manner was untimely because it came well after the basis for the objection became apparent.[25] *See, e.g.*, Tex. R.

---

[24]We note that the Texas Rules of Evidence were amended effective April 1, 2015, after the time of trial in this case in May 2014, but further note that the Texas Supreme Court and Court of Criminal Appeals have noted that the amendments comprise a general restyling of the rules, and with the exception of two rules not applicable here did not make substantive changes. *See* Tex., Final Approval of Amendments to the Texas Rules of Evidence, Misc. Docket No. 15-9048, 78 Tex. B. J. 374 (March 10, 2015) and Tex. Crim. App., Final Approval of Amendments to the Texas Rules of Evidence, Misc. Docket No. 15-001, 78 Tex. B. J. 376 (March 12, 2015).

[25]If the basis for the State's objection was not apparent as early as pretrial—when the State concedes the noncompensability issue was discussed in the context of the State's motion in limine—it certainly became apparent with the admission of Defendant's Exhibits 1, 2, and 6. These exhibits summarize the testimony of each of the witnesses, including valuation and basis for the witness's testimony regarding damages, and each was admitted into evidence prior to each witness's testimony without objection. Even if the exhibits did not make apparent the basis for the State's objection, certainly after the first expert testified and the State made its first "offer of proof," the State was aware of the basis for its objection. Yet, the State waited until all three exhibits had been admitted and *all three experts* had testified before asserting its motion to exclude and strike testimony. Furthermore, even prior to Wickliffe's and Fleet's testimony, the attorney for the State stated to the court that with regard to testimony regarding access, "[i]t should not be allowed, according to case law. And I suspect – and there's three witnesses that are going to testify in court as to their reports and in their depositions who will testify to the exact same thing." On this record, it simply cannot be said that the State's motion to exclude and strike testimony was made immediately after the basis for the objection became apparent. By its own admission, the State not only knew that the evidence was coming, the State had seen it before trial in deposition testimony, and it knew

Evid. 103(a)(1); *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 760 (Tex. 2013) (holding party waived objection where it failed to immediately object, ask for a curative or limiting instruction, or move for a mistrial); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g) (holding party waived objection to expert testimony where it failed to object); b*ut see Santikos*, 144 S.W.3d 455, 459 at n.7 (holding that the county preserved error by objecting to expert testimony when the bases of their opinions became clear, objecting to the jury instruction regarding them, and requesting a new trial); *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 252 (Tex. 2004) (holding no waiver because objection was made immediately after "the basis for the objection became apparent"), *abrogated on other grounds by Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 18 n.58 (Tex. 2008).

Fourth, the State argues that it preserved error through two objections to the testimony by Makens regarding "noncompensable items." As to the first objection, the State lodged a general objection, "Your honor, I have an objection." When the court not once, but twice, sought clarification—through the questions, "What's your objection?" and "So, what's the objection, specifically?"—the State twice responded with a speaking objection that was still nonspecific as to what testimony was related to damages which were allegedly noncompensable under

---

which witnesses would be providing it. The basis for objection being readily apparent to the State on day one of the trial, the State's motion to exclude and strike on day three was untimely. *See* Tex. R. Evid. 103(a)(1).

Texas law. A general objection preserves nothing for review. *Campbell v. State*, 85 S.W.3d 176, 185 (Tex. 2002); *McDaniel v. Yarbrough*, 898 S.W.2d 251, 252 (Tex. 1995). As to the State's only other objection, "We're objecting again at this point because this number includes items that are noncompensable under Texas law," this objection was made just after Makens testified as to the per-acre valuation he assigned to the entire 100-acre tract. Makens's testimony was not objectionable on the grounds stated; thus, the objection was not proper; and the trial court committed no error in overruling it. After Makens testified regarding the value of the 100-acre tract, he continued his testimony and offered testimony regarding remainder damages. The State lodged no objection whatsoever to this subsequent testimony.[26]

Finally, the State argues that it preserved error through its motion for a mistrial following Makens's testimony. In its motion, the State argued that because evidence related to the number of driveways that could be created was included in the evidence Makens offered regarding the safety of the driveway at issue, the evidence presented was "verboten before the jury," and a mistrial should be granted. As Stockton explained in its response, Makens's testimony

---

[26]Furthermore, it is clear from Makens's reference to "Page 26" in his prior answer that he was reading from and referencing Defendant's Exhibit 1—the entire contents of which had already been admitted and published to the jury without objection—and the State had already waived error as to any evidence that was cumulative of other evidence admitted without objection. Tex. R. App. P. 33.1(a)(1)(A); *Perry Homes v. Alwattari*, 33 S.W.3d 376, 386 n.10 (Tex. App.—Fort Worth 2000, pet. denied) (holding that an objection to evidence previously admitted without objection is untimely).

34

was premised on the assumption that the only remaining driveway that was potentially available was unsafe. While inadmissible to recover damages for denial of access, this testimony was relevant to Stockton's theory regarding unsafe access, and, therefore, the evidence was admissible for that limited purpose. Rule of evidence 105 provides,

> [W]hen evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly; but, *in the absence of such request the court's action in admitting such evidence without limitation shall not be a ground for complaint on appeal*.

Tex. R. Evid. 105 (amended 2015) (emphasis added).[27] Because the State failed to request such a limiting instruction at every juncture when this evidence was offered at trial, including in its motion for mistrial, the State waived error on appeal. *See, e.g.*, *Delgado v. State*, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007) ("Once evidence has been admitted without a limiting instruction, it is part of the general evidence and may be used for all purposes."); *Western Reserve Life Assur. Co. of Ohio v. Graben*, 233 S.W.3d 360, 379 (Tex. App.—Fort Worth 2007, no pet.) (holding that appellant was required to obtain a limiting instruction based on limited admissibility of wrongful act evidence for purposes of punitive damages issues).

As for the State's third and last sentence in arguing its second issue – that "the other complaints of increased noise and elevation change are also

---

[27]See footnote 24.

35

noncompensable," the two cases the State cites in support of this proposition are not as far-reaching as the State suggests. Neither case goes so far as to hold that these types of damages are never recoverable;[28] the results in both cases are driven by the facts presented. Furthermore, we have already determined that the testimony regarding unsafe access to the remainder was properly admitted and the trial court did not err in failing to find that a material and substantial impairment of access occurred. Except as mentioned above, in briefing its second issue, the State provides not so much as a hint of any other argument to support its contention that on the facts of this case these remainder damages would not be compensable. We are not obligated to "become advocates for a particular litigant" by performing research and developing argument for that litigant. *Tello v. Bank One, N.A.*, 218 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (internal quotation omitted).

---

[28]While *Felts v. Harris County* holds that the non-recoverability for increased and temporary noise incident to highway construction is well-settled, Stockton did not seek damages for noise related to the highway construction. 915 S.W.2d 482, 485 (Tex. 1996). As to the effect of noise once a highway has been constructed, *Felts* held that while, generally, "noise emanating from a roadway has a similar impact on the community as a whole" and would, therefore, be noncompensable, the court also recognized that damages of a "different, special, or peculiar" nature would be compensable. *Id.*

And while the court in *Santikos* found the elevation in the roadway in question noncompensable, it did so based only on the facts before it—that the injury was "necessarily common to the community of adjacent owners in the entire area." 144 S.W.3d at 461–63 (noting that such damages would be compensable "to the extent they represent injuries peculiar to the property owner that are not experienced in common with the general community").

36

In conducting a legal sufficiency review, we must affirm if there is any evidence of probative value to support the jury's verdict. *International Armament Corp. v. King*, 686 S.W.2d 595, 597 (Tex. 1985) (citing *Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965)). And, as the reviewing court, we cannot substitute our judgment for that of the trier-of-fact, so long as the evidence falls within the zone of reasonable disagreement, and we hold that in this case it does. *Wilson*, 168 S.W.3d at 822. As the testimony and evidence presented by Stockton is both legally and factually sufficient to support the jury's award of $843,365.00 in damages to the remainder of Stockton Bend, we therefore overrule the State's second issue.

### III. Conclusion

Having overruled both of the State's issues on appeal and Stockton's issue on cross appeal, we affirm the judgment of the trial court.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and SUDDERTH, JJ.

DELIVERED: June 9, 2016

37